**UNITED STATES of America, Plaintiff-Appellee,**

v.

**CERTAIN PARCELS OF LAND SITUATED IN the CITY OF VALDEZ, et al., Defendants,**

**City of Valdez, Alaska, Defendant-Appellant.**

**No. 80–3177.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 17, 1981.

Decided Jan. 13, 1982.

Kenneth P. Jacobus, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, Alaska, for defendant-appellant.

Thomas H. Pacheco, Justice Dept., Washington, D. C., argued, for plaintiff-appellee; Rene J. Gonzalez, U. S. Atty., Anchorage, Alaska, James W. Moorman, Anne S. Almy, Washington, D. C., on brief.

Before SKOPIL, FLETCHER and FARRIS, Circuit Judges.

FLETCHER, Circuit Judge:

The City of Valdez[1] appeals from a summary judgment in favor of the United States in a condemnation proceeding that involves a ferry terminal facility in the Valdez Small Boat Harbor. The district court held that the Government need not pay compensation for the dock and dolphins constituting the terminal facility because these improvements are subject to the navigation servitude of the United States. Our jurisdiction rests on 28 U.S.C. § 1291 (1976). We affirm.

I

BACKGROUND

A. Facts

The Valdez Small Boat Harbor is in navigable waters of the United States. The United States Army Corps of Engineers constructed the harbor after the 1964 Alaska earthquake. As part of that construction the Corps of Engineers built a ferry terminal facility consisting of three wooden ramps used as a dock, and twelve cluster pile dolphins.[2] The ferry terminal facility was constructed exclusively with federal funds and was built because the 1964 earthquake destroyed the former terminal, owned by the State of Alaska.

In 1975, the United States initiated condemnation proceedings to acquire three small parcels of land near Valdez for the establishment of a Coast Guard vessel traffic system and port safety station for Prince William Sound and Valdez.[3] All of the ferry terminal facility is located on one of these parcels. Except for a part of the dock ramps, the terminal is below the mean high water mark and thus within navigable waters.

B. Proceedings Below

The parties stipulated to entry of final judgment in the condemnation proceedings as to all issues except whether compensation for the dock and dolphins is due. If found due, the amount of compensation was stipulated by the parties.[4] On cross-motions for summary judgment on the issue of whether compensation was due, the district court granted summary judgment to the United States, finding the improvements subject to the navigation servitude and hence noncompensable. The City of Valdez appeals.

II

ANALYSIS

The navigation servitude is a term used to describe the paramount interest of the United States in navigation and the navigable waters of the nation. The servitude derives from the Commerce Clause and is a concept of power, not of property. *United States v. Twin City Power Co.*, 350 U.S. 222, 224, 76 S.Ct. 259, 260, 100 L.Ed. 240 (1956). Under the servitude, when the United States, in the exercise of its powers over navigation, affects the interests of owners of private property, it is not generally required to compensate the owners. *See United States v. Chicago, M. St. P. & P. R. R. Co.*, 312 U.S. 592, 597, 61 S.Ct. 772, 775, 85 L.Ed. 1064 (1941). *But see Kaiser Aetna v. United States*, 444 U.S. 164, 172, 100 S.Ct. 383, 388, 62 L.Ed.2d 332 (1979).[5]

On appeal, the City of Valdez does not dispute this general definition of the navi-

---

1. The original condemnation proceeding included several additional defendants. All defendants other than Valdez and the State of Alaska were dismissed. Valdez and the State of Alaska further agreed that Valdez would represent all interests claimed by both of them.

2. Dolphins are clusters of closely driven piles used as a fender for a dock or as a mooring or guide for boats.

3. Construction of the vessel traffic system and port safety station was authorized by an Act of Nov. 16, 1973, Pub.L. No. 93–153, Title IV, Sec. 402, 87 Stat. 589, discussed *infra.*

4. Because of our disposition of this case, we, like the district court, do not reach the factual question of whether the United States Government or Valdez owns the terminal facility.

5. We discuss the relationship of *Kaiser Aetna* to this case in part II (B) *infra.*

gation servitude. Rather, it argues that the Government cannot rely on the servitude to avoid payment of compensation unless the United States invokes expressly its Commerce Clause power over navigation. Valdez also argues that even if the navigation power has been invoked, it is not being asserted to aid "navigation in fact" and thus the United States may not rely on the navigation servitude to avoid payment for the ferry terminal facility.

*A. Has the United States properly invoked its Commerce Clause power over navigation in this case?*

For the proposition that the navigation power must be invoked expressly before the navigation servitude can operate in favor of the United States, Valdez cites *United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 70 S.Ct. 995, 94 L.Ed. 1231 (1950) and language in *Federal Power Commission v. Niagara Mohawk Power Corp.*, 347 U.S. 239, 74 S.Ct. 487, 98 L.Ed. 686 (1954), to the effect that "exercise of [the navigation] servitude, without making allowances for preexisting rights under state law, requires clear authorization." *Id.* at 249, 74 S.Ct. at 493.

We find the case law subsequent to *Gerlach Live Stock* and *Niagara Mohawk* contrary to Valdez's position. In *United States v. Twin City Power Co.*, 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1956), the Supreme Court indicated that *Gerlach Live Stock* and *Niagara Mohawk* involved, not a failure to invoke expressly Congress' power over navigation, but a failure to invoke that constitutional power at all. Thus the Court stated:

> The legislative history and construction of particular enactments may lead to the conclusion that Congress exercised less than its constitutional power, fell short of appropriating the flow of the river to the public domain, and provided that private rights existing under state law should be compensable or otherwise recognized. Such were *United States v. Gerlach Live Stock Co.*, *supra*, and *Federal Power*

*Commission v. Niagara Mohawk Power Corp., supra.*

*Id.* at 225, 76 S.Ct. at 261.

The Court in *Twin City Power* outlined the narrow scope of judicial review where Congress has chosen to exercise its Commerce Clause power over navigation. "If the interests of navigation are served, it is constitutionally irrelevant that other purposes may also be advanced." *Id.* at 224, 76 S.Ct. at 260. Or, more precisely, "[i]t is not for [us] ... to substitute [our] judgments for congressional decisions on what is or is not necessary for improvement or protection of navigation." *Id.* Once Congress determines that an action will improve or protect navigation, the Government may rely on the navigation servitude to accomplish that action. *United States v. Chicago, M., St. P. & P. R. R. Co.*, 312 U.S. at 597, 61 S.Ct. 775; *United States v. 422,978 Square Feet of Land, San Francisco*, 445 F.2d 1180, 1184 & n.7 (9th Cir. 1971) (and cases cited therein). *But see Kaiser Aetna v. United States*, 444 U.S. at 172, 100 S.Ct. 388. We may not second guess Congress' decision that the action will aid navigation.

In this case, Congress relied on its navigation power to authorize the port safety station project that led to Coast Guard use of the ferry terminal facility. The safety station was built pursuant to an Act of November 16, 1973, Pub.L. No. 93–153, Title IV, Sec. 402, 87 Stat. 589. Section 402 directed the secretary of the department in which the Coast Guard was operating to establish a vessel traffic control system for Prince William Sound and Valdez, Alaska pursuant to authority contained in Title I of the Ports and Waterways Safety Act of 1972, 33 U.S.C. § 1221 (1976). The pertinent section of the Ports and Waterways Safety Act grants authority to establish vessel traffic control systems and port safety stations "[i]n order to prevent damage to, or the destruction or loss of any vessel, bridge, or other structure on or in the navigable waters of the United States, ... and to protect the navigable waters and the resources therein." *Id.* We find in Congress' action a clear purpose to improve and protect navigation. That is all that is re-

quired to invoke the navigation power and bring the navigation servitude into play.[6]

*B. Is reliance on the navigation servitude limited to situations where the Government proves aid to "navigation in fact?"*

The City of Valdez argues that even if Congress has invoked properly its Commerce Clause power over navigation, the Government still may not rely on the navigation servitude to avoid payment for the ferry terminal facility because construction of a vessel traffic control and safety facility does not "aid navigation in fact." The city contends in effect that the navigation servitude relieves the Government of its duty to pay for the ferry terminal facility only if the Government improves navigation by removing the wharf because it obstructs navigable waters. Since the ferry terminal was not removed but incorporated into a new dock, Valdez contends that the Government took the facility for its own use and not to aid navigation and, accordingly, should compensate the city.

■ In the past, the concept of navigation servitude did not encompass a test or requirement of navigation in fact as Valdez urges. *See, e.g., United States v. Commodore Park*, 324 U.S. 386, 393, 65 S.Ct. 803, 806, 89 L.Ed. 1017 (1945); *Lewis Blue Point Oyster Cultivation Co. v. Briggs*, 229 U.S. 82, 87–88, 33 S.Ct. 679, 680, 57 L.Ed. 1083 (1913); *Weatherford v. United States*, 606 F.2d 851 (9th Cir. 1979); *United States v. 422,978 Square Feet of Land*, 445 F.2d at 1184–87. Valdez insists, however, that *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), *Vaughn v. Vermilion Corp.*, 444 U.S. 206, 100 S.Ct. 399, 62 L.Ed.2d 365 (1979), and *United States v. Fuller*, 409 U.S. 488, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973) limited the capacity of the Government to rely on the

navigation servitude so that it now may be used only "to aid navigation in fact" in the narrow sense of removing offending obstructions.

We disagree. None of the cases cited by Valdez establish such a proposition. *Kaiser Aetna* holds "that the 'right to exclude' [the public from privately created navigable waters], falls within [the] category of interests that the Government cannot take [under the navigation servitude] without compensation." 444 U.S. at 179–80, 100 S.Ct. at 392–393. *Vaughn v. Vermilion Corp.* is to the same effect. This case is factually unlike *Kaiser* and *Vaughn*. It does not involve public access to waterways created by private effort and capital, but rather involves facilities constructed in navigable waters.[7] *United States v. Fuller*, cited by Valdez, also provides no support for its position.

■ We are persuaded that the instant case is governed by the line of cases holding that private improvements connected to fastlands but located in navigable waters may be altered or removed by the Government to improve navigation without compensating the owner. *See, e.g., United States v. Rands*, 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967); *United States v. Commodore Park*, 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017 (1945); *United States v. Chicago, M., St. P. & P. R. R. Co.*, 312 U.S. 592, 61 S.Ct. 772, 85 L.Ed. 1064 (1941); *Greenleaf Johnson Lumber Co. v. Garrison*, 237 U.S. 251, 35 S.Ct. 551, 59 L.Ed. 939 (1915); *Union Bridge Co. v. United States*, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523 (1907). In *United States v. Chicago, M., St. P. & P. R. R. Co.*, the Court held that the United States was not obliged to pay a riparian landowner for injury to structures located below the mean high water mark where the injury was caused by raising the water level

---

**6.** As Justice Rehnquist points out in *Kaiser Aetna*, the fact that the Government has invoked its power over navigation does not lead automatically to the conclusion that it may also rely on the navigation servitude. 444 U.S. at 174–75, 100 S.Ct. at 389–390.

**7.** In fact, this case involves no private investment at all. The ferry dock and dolphins originally were constructed entirely with federal funds. Thus nothing in the facts of this case could lead Valdez to have any investment-backed expectations. *See Kaiser Aetna v. United States*, 444 U.S. at 179, 100 S.Ct. at 392.

to improve navigation. 312 U.S. at 596–97, 61 S.Ct. at 775. The Court stated:

> It is not true, as respondents maintain, that only structures in the bed of a navigable stream which obstruct or adversely affect navigation may be injured or destroyed without compensation by a federal improvement of navigable capacity. On the contrary, any structure is placed in the bed of a stream at the risk that it may be so injured or destroyed; and the right to compensation does not depend on the absence of physical interference with navigation.

*Id.* at 599, 61 S.Ct. at 776. The ferry terminal dock and dolphins in this case are precisely the kind of improvement, located in navigable waters, that is subject to the Government's "dominant power" over navigation. *See id.* at 596–97, 61 S.Ct. at 775.

The fact that the Government altered rather than destroyed the dock and dolphins is immaterial because the power to destroy a structure to improve navigation includes the power to alter that structure for the same purpose. *See Union Bridge Co. v. United States,* 204 U.S. at 399–400, 27 S.Ct. at 379–380.[8] In this case, some parts of the ferry terminal facility were removed, other parts were incorporated into a Coast Guard facility necessary to ensure vessel safety on navigable waters in Prince William Sound. Under the cases dealing with condemnation of fastlands and alteration or removal of improvements in navigable waters, a purpose to improve and protect navigation is the essential requirement. Where that requirement is met, as it is here, the Government ordinarily may rely on the navigation servitude to avoid payment for its use of the improvements.

Accordingly, the judgment of the district court, that the United States need not pay Valdez for the dock and dolphins, is AFFIRMED.

---

8. We are not here faced with the issue of whether Valdez could have insisted on a right to remove the dock and dolphins rather than allow the Government to alter the structures to suit the Government's purpose. Valdez has never argued that once the fastland was condemned, it had a right to remove any improvements located in navigable waters where the improvements could not be the subject of compensation. Accordingly, we express no opinion on this point.