**CHEROKEE NATION OF OKLAHOMA,**
**Plaintiff-Appellee,**

v.

**UNITED STATES of America,**
**Defendant-Appellant.**

**No. 84–2355.**

United States Court of Appeals,
Tenth Circuit.

Jan. 23, 1986.

James G. Wilcoxen, Muskogee, Okl. (Paul M. Niebell, Washington, D.C., with him on brief), for plaintiff-appellee.

Jeffrey P. Minear, Dept. of Justice, Washington, D.C. (Jacques B. Gelin and F. Henry Habicht II, Washington, D.C., with him on briefs), for defendant-appellant.

Before MOORE and SETH, Circuit Judges, and MATSCH, District Judge.*

JOHN P. MOORE, Circuit Judge.

This is an interlocutory appeal granted pursuant to 28 U.S.C. § 1292(b) to consider

* Honorable Richard P. Matsch, United States District Judge for the District of Colorado, sitting by designation.

whether the assertion of a navigational servitude by the United States prevents liability for an alleged Fifth Amendment Taking of land held in fee simple by the Cherokee Nation of Oklahoma (Cherokee Nation or appellee). A second issue, whether the exercise of a navigational servitude constituted the breach of some duty of care to the Cherokee Nation, was reserved pending this appeal. The district court sustained the Cherokee Nation's motion for summary judgment, holding that the United States, having granted fee simple title to the banks and bed of the Arkansas River with no reservation of a navigational servitude, is liable for a taking of private property and must pay just compensation. The United States sought interlocutory review contending the construction of the Arkansas River Navigation System, the McClellan-Kerr Navigation Project (the Project), does not constitute a compensable taking of the Cherokee Nation's interest in the bed of the Arkansas River. Upon our review of the facts of this particular case and the law, we affirm the district court's holding but do not adopt its reasoning. We do not address the second issue.

By statute, Pub.L. No. 97–385, 96 Stat. 1944 (1982),[1] Congress conferred special jurisdiction on the district court to hear the Cherokee Nation's claim for damages.[2] The Cherokee Nation alleged that to create the Project, the United States constructed dams and waterways, altering the channel of the river and causing the loss of valuable deposits of sand, gravel, and coal.

Specifically, the Webbers Falls Lock and Dam No. 16, the Robert S. Kerr Lock and Dam No. 15, and the W.D. Mayo Lock and Dam No. 14, were designated as located in whole or in part on Indian lands granted in the 1838 patent. The Cherokee Nation alleged a Fifth Amendment Taking and sought just compensation for the past and future loss of the mineral deposits, fair market value of the damsites, and other damage to the bed and banks of the Arkansas River. The parties stipulated to the facts and agreed to address the issue of liability separately on cross-motions for summary judgment.

## I. Standard of Review

We premise our review of the district court's granting judgment in favor of the Cherokee Nation, on cross-motions for summary judgment, on the same considerations before the trial court under Fed.R. Civ.P. 56(c). *United States v. Gammache*, 713 F.2d 588, 594 (10th Cir.1983). In examining the record, we, too, must decide whether any genuine issues of material fact exist to preclude one of the cross-movants from proceeding to litigate that issue. Any inferences appropriately arising must be viewed in the light most favorable to the party against whom they are offered. *Weir v. The Anaconda Co.*, 773 F.2d 1073, (10th Cir.1985); *Brown v. Parker-Hannifin Corp.*, 746 F.2d 1407, 1411 (10th Cir. 1984). An ultimate determination is equally and necessarily predicated on the correct application of the substantive law. *Dai-*

1. The statute provides in part:
 [J]urisdiction is hereby conferred upon the United States Court of Claims, or upon the United States District Court for the Eastern District of Oklahoma, to hear, determine, and render judgment, under the jurisdictional provisions of section 2 of the Indian Claims Commission Act of August 13, 1946, as amended (60 Stat. 1049, 1050; 25 U.S.C. 70a), on any claim which the Cherokee Nation of Oklahoma may have against the United States for any and all damages to Cherokee tribal assets related to and arising from construction of the Arkansas River Navigation System, including, but not limited to, the value of sand, gravel, coal, and other resources taken, the value of damsites and powerheads of dams constructed on that part of the Arkansas riv-

erbed within Cherokee domain in Oklahoma, without the authority or consent of said Cherokee Nation....

2. This claim derives from an initial appraisal done by the Department of Interior after the Supreme Court concluded the Cherokee Nation held title to the bed and banks. *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970). The Department of Interior valued the entire Cherokee interest in the riverbed at $177 million. From 1976 until 1980 neither Congress nor the Department of Interior could agree on liability or an appropriation for the loss. After Congress failed to act on the Cherokees' direct petition for $8.5 million in claimed damages, this special jurisdictional grant was enacted to litigate the claim.

*tom, Inc. v. Pennwalt Corp.,* 741 F.2d 1569, 1574 (10th Cir.1984); *Western Casualty & Surety Co. v. National Union Fire Insurance Co.,* 677 F.2d 789 (10th Cir. 1982). This standard is not talismanic but fully requires that we look beyond the pleadings to determine whether the moving parties present any factual dispute capable of a trial's resolution. We must be convinced beyond a reasonable doubt that this "salutary device" appropriately resolves the issue before us. Fed.R.Civ.P. 56 advisory committee note; *See also Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.,* 516 F.2d 33, 36 (10th Cir.1975).

## II. Background

Although the facts giving rise to this particular case are not in dispute, a conflicting view of the broader historical background underpins the divergent legal analysis. Our task is simplified by the Supreme Court's review in *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970), on which the district court also relied. At issue in *Choctaw Nation* was the title to land underlying certain navigable portions of parts of the Arkansas River in Oklahoma. Beginning with the post-revolutionary period, the Court traced the early history of the Cherokee Nation as it, like the other Five Civilized Tribes,[3] experienced the increasing pressure of white settlement in their territory and the correspondingly insistent federal removal policy. Wary of promises of a permanent home and federal protection, the Cherokees resisted relocation and met with hostility, both from the State of Georgia, where the Cherokees were settled, and the federal government, which was anxious to placate white settlers.[4]

The Court reviewed this history as background for an understanding of the Treaty of New Echota, signed on December 29, 1835, and negotiated with a faction of the Cherokees fearful of a forced military removal. In the Treaty of New Echota, the United States granted a vast area of its western territory, now the eastern part of the State of Oklahoma, in exchange for the cession of all Cherokee land east of the Mississippi River. *Choctaw Nation,* 397 U.S. at 627, 90 S.Ct. at 1332–33. The United States covenanted to convey these lands in fee simple. The Cherokee Nation was promised a permanent home which would "never be embraced within the boundaries of any State or Territory." Treaty of New Echota, December 29, 1835, 7 Stat. 478, 2 Kapp 439. In 1838, those Cherokees who refused voluntary removal suffered the forced migration, later referred to as the "Trail of Tears,"[5] to these western lands. The Treaty of New Echota was intended to provide a permanent and enduring resolution for the Cherokee Nation. *Choctaw Nation,* 397 U.S. at 635, 90 S.Ct. at 1336–37.

Nevertheless, these solemn vows were tested by new settlement pressure in Indian territory. *Id.* at 628, 90 S.Ct. at 1333. Unable to relocate the Cherokees, the new federal policy sought instead to allot Indian lands and terminate tribal affairs in order to facilitate Oklahoma's admission to the Union on an "Equal Footing" with the original states. Oklahoma relied on this Equal Footing Doctrine in *Choctaw Nation* to claim title to the bed of the Arkansas River in which Oklahoma had executed various leases.

In holding that the United States intended to and did convey to the Indians fee simple title to the bed of the Arkansas River, the *Choctaw* court relied on both

---

3. The Cherokees, Creeks, Choctaws, Chickasaws and Seminoles comprise the "Five Civilized Tribes."

4. *See* F. Cohen, Handbook of Federal Indian Law 78–84 (1982 ed.) and citations therein. Georgia's confrontation with the Cherokees precipitated a crisis between the Cherokees, the Supreme Court and Georgia. As related by Cohen, Georgia, impatient with the federal removal policy, extinguished Indian title and sought to distribute the Cherokee lands. Consequently, some Cherokees were initially resettled in Arkansas.

5. More than 4,000 Cherokees perished in the march. "The Trail of Tears has come to symbolize the brutality of Indian removal." Cohen at 92.

"the circumstances of the treaty grants and the countervailing rule of construction" that treaties with Indian nations must be interpreted as the Indians would have understood their meaning.[6] Citing *Shively v. Bowlby*, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894) (title to the riverbed is an incident of state sovereignty); *Brewer-Elliott Oil and Gas Co. v. United States*, 260 U.S. 77, 43 S.Ct. 60, 67, L.Ed. 140 (1922) (Congress has the power to convey land below the high water mark of navigable waters; thus, the United States expressly conveyed a portion of riverbed to Osages); and *United States v. Holt State Bank*, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 (1926) (United States' intention to convey must be definitely declared), the Court recognized that the literal letter of these holdings did not require that "courts blind themselves to the circumstances of the grant in determining the intent of the grantor." *Choctaw Nation*, 397 U.S. at 635, 90 S.Ct. at 1336–37. The Court added:

> As a practical matter, reservation of the river bed would have meant that petitioners were not entitled to enter upon and take sand and gravel or other minerals from the shallow parts of the river or islands formed when the water was low. In many respects however, the Indians were promised virtually complete sovereignty over their new lands.... We do not believe that petitioners would have considered that they could have been precluded from exercising these basic ownership rights to the river bed, and we think it very unlikely that the United States intended otherwise.

*Id.* at 636, 90 S.Ct. at 1337. The Court gave full effect to the government's promise that no State or Territory would ever embrace the lands granted and refused to engage in the legal fiction that the river bisecting the Cherokee land was excluded from the grant. In a later appeal, we affirmed the district court's order on remand from *Choctaw Nation*, holding that the Supreme Court had decided past and present ownership. *Cherokee Nation v. Oklahoma*, 461 F.2d 674, 677–78 (10th Cir. 1972).

## III. Navigational Servitude

### A.

Against this background, we now decide whether the district court erred in holding that the failure to reserve a navigational servitude in the patent amounted to a loss of the right to assert it. The United States argues the navigational servitude is a constitutional power arising from the Commerce Clause and permits no "special exception" for Indian tribes. To conclude, as did the district court, that having failed to reserve a navigational servitude, the United States loses that power is "unprecedented" according to appellant. Moreover, contrary to the district court's reference to the Cherokee Nation as a sovereign nation, the United States contends the appellee is a quasi-sovereign at the sufferance of Congress and subject to the dominant power of a navigational servitude. Indeed, appellant concludes that if the fact the Cherokees own the riverbed is set aside, this case is only an "ordinary instance" in which the United States seeks to assert its dominant authority.

The government supports its position by focusing on the following language of *Choctaw Nation:* "Indeed the United States seems to have had no present interest in the river bed at all; it had all it was concerned with in its navigational easement via the constitutional power over commerce." *Choctaw Nation*, 397 U.S. at 636, 90 S.Ct. at 1337. Although the Court was concerned with the issue of title in *Choctaw Nation*, the quoted language being merely dictum, it is instructive here to provide direction for our inquiry.

■ We agree with appellant that the term navigational servitude describes the superior interest of the United States in

---

**6.** The Court noted that "these treaties are not to be considered as exercises in ordinary conveyancing. The Indian Nations did not seek out the United States and agree upon an exchange of lands in an arm's length transaction. Rather treaties were imposed upon them and they had no choice but to consent." *Choctaw Nation*, 397 U.S. at 631, 90 S.Ct. at 1334.

navigation and the nation's navigable waters. *United States v. Twin City Power Co.*, 350 U.S. 222, 224, 76 S.Ct. 259, 260–61, 100 L.Ed. 240 (1956). "The servitude derives from the Commerce Clause and is a concept of power, not of property." *Id.* The term expresses the notion that the right of the public to use a waterway supersedes any claim of private ownership. *United States v. Cress*, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917); *United States v. Chandler-Dunbar Water Power Co.*, 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913). Indeed, as a matter of federal power, the navigational servitude has been most useful in defining federal interests when conflicting state and local controls are imposed on interstate waters. *See Twin City Power, supra.*

■ In the interest of interstate commerce, to improve navigation, and to preserve the waterways for public use, the navigational servitude may thus be asserted as an exception to the Taking Clause. This exception derives from the principle that the power over our nation's waters is an incident of sovereignty. *Shively v. Bowlby*, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1893). However, while the exercise of the navigational servitude may create an exception to the government's obligation to pay just compensation under the Eminent Domain Clause of the Fifth Amendment, the Supreme Court has never held that "the navigational servitude creates a blanket exception to the Taking Clause whenever Congress exercises its Commerce Clause authority to promote navigation." *Kaiser Aetna v. United States*, 444 U.S. 164, 172, 100 S.Ct. 383, 389, 62 L.Ed.2d 332 (1979). Each case requires an ad hoc examination and balancing of the public and private rights at stake. *Cress*, 243 U.S. at 321, 37 S.Ct. at 382.

■ At the outset, we are not impressed by the failure of the United States to re-

serve a navigational easement in the treaty grant, despite other reservations.[7] As stated, the navigational servitude is a power arising from the Commerce Clause and triggered by the perception of Congress that this dominant right exists in the interest of navigation. Thus, it is certain the United States retained a navigational servitude in the Arkansas River. The existence of the power is not at issue. Rather, it is its effect that concerns us.

The Supreme Court has reviewed a variety of cases on the issue of whether compensation is required in specific instances when a navigational servitude is exercised. One group of claimants denied recovery is riparian owners claiming losses arising from the raising or lowering of the water level in a navigable stream. *See, e.g., Twin City Power, supra.*, and *Chandler-Dunbar, supra.* No compensation is required for private improvements connected to fastlands but located in navigable waters. *See, e.g., United States v. Rands*, 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967); *United States v. Commodore Park*, 324 U.S. 386, 65 S.Ct. 803, 89 L.Ed. 1017 (1945); *United States v. Chicago, M., St. P. & P.R. Co.*, 312 U.S. 592, 61 S.Ct. 772, 85 L.Ed. 1064 (1941). Nor is compensation ordered when structures in the water (wharves, ferry docks) are condemned or altered to improve navigation or navigational safety. *Greenleaf Lumber Co. v. Garrison*, 237 U.S. 251, 35 S.Ct. 551, 59 L.Ed. 939 (1915); *United States v. City of Valdez*, 666 F.2d 1236 (9th Cir.1982).

However, in each of these cases, the Supreme Court has emphasized that "the non-compensable loss was related, either directly or indirectly to the riparian owner's 'access to, and use of, navigable waters.'" *Kaiser Aetna*, 444 U.S. at 189, 100 S.Ct. at 398 (Blackmun, J., dissenting) (citing *Rands*, 389 U.S. at 124–25, 88 S.Ct. at

---

7. The grant was made "subject to the right of the United States to permit other tribes ... to get salt on the salt plain" and included three reservations: (1) the right to permit other tribes to get salt on the western part of the grant; (2) any rights to lands assigned the Quapaws which

might be within the bounds of these Cherokee lands; and (3) the right to establish and maintain military posts and roads, together with the free use of land, timber, fuel, and materials for the construction and support of those facilities.

267–68). Even the *Kaiser* dissent acknowledged that the distinction between compensable and non-compensable values should have nothing to do with the *use* of navigable waters. Moreover, it is the character of the invasion, not the amount of damage resulting from it, that determines whether a taking has occurred. *Cress,* 243 U.S. at 328, 37 S.Ct. at 385.

■ Thus, the assertion of a navigational servitude on particular waters acknowledges *only* that the property owner's right *to use* these waters is shared with the public at large. *Rands,* 399 U.S. at 125, 88 S.Ct. at 268. When the exercise of that public power affects private ownership rights not connected to a navigational use, the court must balance the public and private interests to decide whether just compensation is due. The navigational servitude is not without constitutional limitation. Furthermore, if Indian property is taken for non-Indian use within this context, constitutional strictures are equally applicable. *See Shoshone Tribe of Indians v. United States,* 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360 (1937); *Choate v. Trapp,* 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912).

The uniqueness of the present case derives from the Cherokee Nation's fee simple ownership of the banks and bed of the Arkansas River. The Cherokee Nation is not a mere riparian owner. Title to the banks and bed above and below the high water mark resides with the tribe. This ownership is secured by treaty. The *Choctaw* court was unequivocal in deciding that the treaty could only be understood in the context of the Cherokee Nation's history. The United States intended that title to the dry bed left from avulsive changes in the river's course remain with the tribe. *Choctaw Nation,* 397 U.S. at 634, 90 S.Ct. at 1336. Similarly, if the river is flooded and Indian lands and resources that had once

been dry bed are altered or destroyed, the Cherokee Nation's tribal assets have equally been affected.

The Court has recognized that *Choctaw Nation* is unique in a line of cases construing reservation grants and treaty rights. In *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), the nature and scope of the Crow Nation's power to regulate hunting and fishing rights by non-Indians was at issue. The Court held that title to the riverbed did not pass with the grant of tribal lands. Distinguishing *Choctaw Nation,* the Court explained, "the finding of a conveyance of the riverbed in *Choctaw Nation* was based on very peculiar circumstances not present in this case." *Id.* at 556, n. 5, 101 S.Ct. at, 1253–54 n. 5. The Court underscored the "special emphasis" placed on the government's promise that the lands reserved to the Choctaws and the Cherokees would never become part of any state. "Neither the *special historical origins* of the Choctaw and Cherokee treaties nor the *crucial provisions* granting Indian lands in fee simple and promising freedom from state jurisdiction in those treaties have any counterparts in the terms and circumstances of the Crow treaties of 1851 and 1868." *Id.*[8]

■ In the face of the Supreme Court's emphasis of the special circumstances surrounding the grant to the Cherokee Nation, we must also consider the principle that rights secured by treaty will not be deemed to be abrogated or modified absent a clear expression of Congressional purpose. *United States v. Winnebago Tribe of Nebraska,* 542 F.2d 1002, 1005 (8th Cir.1976). "[T]he intention to abrogate or modify a treaty is not to be lightly imputed to Congress." *Menominee Tribe of Indians v. United States,* 391 U.S. 404, 413, 88 S.Ct. 1705, 1711, 20 L.Ed.2d 697 (1968); *Accord Washington v. Washington State Com-*

8. The government cites *Montana* to support its contention that the navigational servitude precludes the Cherokee Nation's taking allegation. The cases are not similar. The *Montana* court expressly held that title to the river passed to the state upon its admission to the Union; *Choctaw*

*Nation* holds the opposite. *Confederated Salish and Kootenai Tribes v. Namen,* 534 F.2d 1376 (9th Cir.), *cert. denied,* 429 U.S. 929, 97 S.Ct. 336, 50 L.Ed.2d 300 (1976), is equally inapposite to the government's argument.

878

*mercial Passenger Fishing Vessel Association,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979).

Appellee cites *Squire v. Capoeman,* 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956), a tax case involving Indian lands, for the proposition that the language used in treaties with the Indians must be read to assure the full Congressional intention behind the grant. In concluding that timber harvested from Indian lands was not subject to capital gains tax, the *Capoeman* court noted that adding a tax to the product of the land set aside by the treaty would "erode" the "major value" of the land. "The land no longer serves the purpose for which it was by treaty set aside to his ancestors, and for which it was allotted to him." *Id.* at 10, 76 S.Ct. at 617. Similarly, to take a valuable portion of the grant to the Cherokee Nation without compensation would alter the purpose for which Congress set aside the land originally. *See also Moore v. United States,* 157 F.2d 760 (9th Cir.1946).

■ Indeed, the Supreme Court has recognized that Indian treaty rights are a form of property protected by the Fifth Amendment. *See Menominee Tribe,* 391 U.S. at 413, 88 S.Ct. at 1711; *Shoshone Tribe,* 299 U.S. at 497, 57 S.Ct. at 251–52. Moreover, the Congressional power of eminent domain is strictly construed when Indian trust property is at issue. *United States v. Creek Nation,* 295 U.S. 103, 110, 55 S.Ct. 681, 684, 79 L.Ed. 1331 (1935). Thus, if the effect of exercising a navigational servitude is to alter or extinguish rights secured by treaty and unrelated to the power to use without the express authorization of Congress, just compensation

is required.[9] To create as sweeping a power for which the government here argues in the light of these constitutional safeguards would distort the very nature and scope of the navigational servitude.

**B.**

The exercise of the navigational servitude must also be examined within the context of the trust relationship between the Cherokee Nation and the federal government. Although the Cherokee lands were allotted, Congress provided that the remaining unallotted tribal property would "be held in trust by the United States for the use and benefit of the Indians." Act of April 26, 1906, § 27, 34 Stat. 148, cited in *Choctaw Nation,* 397 U.S. at 627, 90 S.Ct. at 1332–33. This trust responsibility articulated in the earliest Indian cases [10] mandates not only a standard of conduct but also a limitation of Congressional power. In *United States v. Sioux Nation of Indians,* 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed.2d 844 (1980), the Supreme Court stated that in every case where a taking of treaty-protected property is alleged, a reviewing court must recognize that tribal lands are subject to the Congressional power to control and manage the tribe's affairs. "[T]his power to control and manage [is] not absolute. While extending to all appropriate measures for protecting and advancing the tribe, it [is] subject to limitations inhering in ... a guardianship and to pertinent constitutional restrictions." *Id.* at 415, 100 S.Ct. at 2741.

■ The Cherokee Nation contends that a fiduciary relationship between the United States and the tribe imposes a distinct obligation on the government in dealing with

9. Congress must specifically authorize the taking of Indian trust property. *United States v. Santa Fe Pac. R. Co.,* 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941). *See also Winnebago Tribe of Nebraska, supra.* In *Winnebago,* the court held that the United States, through the Army Corps of Engineers, was without authority to take tribal lands by eminent domain without an express Congressional authorization for a project authorized by the 1944 Flood Control Act, which similarly authorized construction of the McClellan-Kerr Navigation Project.

10. *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831); *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832); *United States v. Kagama,* 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886). Justice Marshall's early characterization of these "domestic dependent nations ... in a state of pupilage" best resembling the relationship of "a ward to his guardian" is often quoted.

dependent Indian wards. Like any other trust relationship, the United States, as trustee, is obligated to act for the benefit of the tribe absent Congressional authorization to the contrary. *See United States v. Santa Fe Pac. R. Co.*, 314 U.S. 339, 356, 62 S.Ct. 248, 256, 86 L.Ed. 260 (1941). Congress did not include an authorization to take, compensation for the taking, or a statement of overriding public need as related to these particular lands when it enacted the 1944 Flood-Control Act and designated the Arkansas River Project. *See Winnebago Tribe of Nebraska, supra.*

The government urges that the Cherokee Nation's reliance on fiduciary principles is misplaced and that we should look solely to constitutional law to define the tribe's property rights in the river. To the contrary, the Cherokee Nation's constitutionally protected property rights are subject to Congress' power to control and manage. *Creek Nation*, 295 U.S. at 109–10, 55 S.Ct. at 684. "[T]hat power does not extend so far as to enable the government 'to give tribal lands to others, or to appropriate them to its own purposes, without rendering, or assuming an obligation to render, just compensation.'" *Shoshone Tribe*, 299 U.S. at 497, 57 S.Ct. at 251–52 (citation omitted). Nor can that duty be preempted and subsumed by the navigational servitude.

### C.

█ The government argues that there are no exceptional circumstances present in this case to remove its scrutiny from the routine analysis given any application of a navigational servitude. We believe that the language of *Choctaw Nation* and *Montana* refutes this contention. Our result is hinged on this precedent. The Cherokee Nation has never asserted exclusive use or control of the Arkansas River, nor has it denied the power of the federal government to exercise its dominant control over interstate commerce. Instead, the Cherokee Nation maintains that its title to part of the Arkansas River makes the Arkansas a uniquely private waterway held by the United States in trust for the tribe. Contrary to the government's inference, this status has not been lost simply because the tribe has not excluded navigation. The Cherokee Nation has not contested the government's right to use the navigable waters, but complains only of the effect of that use on its property interest.

The government finally warns that if we affirm the district court, we give leave to untold numbers of tribes seeking compensation for similar activity on waterways in their lands. Yet, from all we have said, it should be clear the result here is tied to and limited by the unique circumstances of Cherokee history and the terms of the treaty patent. Whatever other actions our holding might generate cannot preclude a just result in this case.

The government asks us to disregard the absolute grant in the treaty, the rules of construction of treaties, and the trust relationship, each a separate check on Congressional power, to hold that the navigational servitude represents a preemptive power exempting it from liability. This we cannot do. We do not question the exercise of the navigational servitude to improve the navigation in the Arkansas River. We do question the impact of that exercise on the subservient property. We hold the navigational servitude does not exempt the United States from liability for the alleged taking of tribal property.

### IV. Conclusion

The substance of what we hold here is while the United States can exercise the navigational servitude in the waterway which courses through the property of the Cherokees, and while the Cherokees cannot interfere with the exercise of this right of sovereignty, the Cherokees have a right to compensation for any consequent loss of property or diminution of value. This right arises out of, and is circumscribed by, the Treaty of New Echota, and has nothing to do with riparian rights normally flowing from the ownership of property adjacent to waterways.

In light of this holding, it remains for the trial court to determine whether and to

what extent the Cherokee Nation has been injured by the exercise of the navigational servitude. This will require a factual inquiry not dissimilar from that undertaken in an ordinary condemnation case. The trial court will also have to consider the second question raised but reserved during the course of this appeal, and that is whether the fiduciary duty owed by the United States to the Cherokee Nation was breached as a matter of fact. The result reached by the trial court on the issue appealed is affirmed.

SETH, Circuit Judge, dissenting:

I must respectfully dissent from the position taken by the majority for the reasons hereinafter expressed.

This is an action for compensation for property used by the United States in the Arkansas River Navigation Project. The plaintiff asserts that the Arkansas River is a "private stream" belonging to the Cherokees because they own the stream bed under a title acquired from the United States. Plaintiff nevertheless acknowledges that it is a navigable river. The Government argues that its exercise of the navigational servitude rights under the Constitution is founded on improvements to navigation directed by Congress on a navigable river and thus the nature of the ownership of the stream bed or how such title may have been acquired is not significant.

The improvements to navigation on the Arkansas River have extended over a long period of time. The river is one of the great rivers of the country and provided access from the Mississippi to the West since early times. The river traffic is now large. The improvements to navigation with which we are here concerned were directed by Congress in 1946 (Act of July 24, 1946). The Project completed in 1971 was known as the McClellan-Kerr Arkansas River Navigation System. There can be no serious challenge to the fact that Congress determined that the Project was for the benefit of navigation and that this was a "legislative judgment." *United*

*States v. Twin City Power Co.,* 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240.

The plaintiff herein was one of the petitioners in *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615, decided by the Supreme Court in 1970. The Court there held after considering the treaties and patent:

"[T]he United States intended to and did convey title to the bed of the Arkansas River below its junction with the Grand River ... in the grants it made to petitioners."

397 U.S. at 635–36, 90 S.Ct. at 1336–37. By this litigation which concerned only the bed of the river, it was determined that the Cherokees received title by patent to the entire river bed of the Arkansas from the Grand River to the Canadian River and the North one-half of the bed from the Canadian to the Arkansas-Oklahoma State line as against the claim of the State of Oklahoma. This title was a determinable fee and was an execution of the title obligations in the several treaties. The patent, of course, covered a large tract of land of which the disputed stream bed was a small element.

The Cherokee lands were made subject to allotments to individual Indians beginning about 1898 (30 Stat. 495) as was done generally throughout the country as a matter of policy. (See the General Allotment Act of 1887.) Much of the land was allotted and the remainder is held in trust by the United States for the Cherokees. The Tribe ceased to exist as a governmental entity in 1906 but was later reorganized.

This action is based by plaintiff on its undisputed ownership of the bed of the Arkansas River. The claim apparently is not based on riparian ownership, but it is obvious that the plaintiff was at one time a riparian owner and may be now as to some tracts. But, in any event, the nature and source of plaintiff's title makes no real difference.

All concerned acknowledge that the Arkansas River in this area is navigable. It carries a substantial tonnage of freight and has been an active waterway since the settlement of the West. The Court in *Choc-*

*taw*, as indicated, was concerned with title to the stream bed but nevertheless stated:

"Indeed, the United States seems to have had no present interest in retaining title to the river bed at all; it had all it was concerned with in its navigational easement via the constitutional power over commerce."

397 U.S. at 635, 90 S.Ct. at 1336–37. The Cherokees, as stated in *Cherokee Nation v. Oklahoma*, 402 F.2d 739, 745 (10th Cir.), had taken the position that the ownership of the stream bed was "not necessary to the exercise of control over navigation incidental to the authority of the Government under the Commerce Clause."

In any event, in this country navigable rivers are "public property" and have been since the earliest time. *Gilman v. Philadelphia*, 3 Wall. 713, 70 U.S. 713, 18 L.Ed. 96; *United States v. Rands*, 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329. Navigation on such rivers has been under the exclusive control of the federal Government—of Congress—under the Commerce Clause. *Gibbons v. Ogden*, 9 Wheat 1, 22 U.S. 1, 6 L.Ed. 23.

In *United States v. Rands*, 389 U.S. 121, 122–23, 88 S.Ct. 265, 266–67, 19 L.Ed.2d 329, the Court said:

"The Commerce Clause confers a unique position upon the Government in connection with navigable waters. 'The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States.... For this purpose they are the public property of the nation, and subject to all the requisite legislation by Congress.' *Gilman v. Philadelphia*, 3 Wall. 713, 724–725 [18 L.Ed. 96] (1866). This power to regulate navigation confers upon the United States a 'dominant servitude,' *FPC v. Niagara Mohawk Power Corp.*, 347 U.S. 239, 249 [74 S.Ct. 487, 493, 98 L.Ed. 666] (1954), which extends to the entire stream and the stream bed below ordinary high-water mark. The proper exercise of this power is not an invasion of any private property rights in the stream or the lands underlying it, for the damage sustained does not result from taking property from riparian owners within the meaning of the Fifth Amendment but from the lawful exercise of a power to which the interests of riparian owners have always been subject. *United States v. Chicago, M., St. P. & P.R. Co.*, 312 U.S. 592, 596–597 [61 S.Ct. 772, 775, 85 L.Ed. 1064] (1941); *Gibson v. United States*, 166 U.S. 269, 275–276 [17 S.Ct. 578, 580, 41 L.Ed. 996] (1897)."

The Court on this subject has relied frequently on *United States v. Chicago, Milwaukee, St. Paul & P.R. Co.*, 312 U.S. 592, 61 S.Ct. 771, 85 L.Ed. 1064. The opinion in that case considers several issues here raised. The Court there in part said, at 596–97, 61 S.Ct. at 775:

"And the determination of the necessity for a given improvement of navigable capacity, and the character and extent of it, is for Congress alone. Whether, under local law, the title to the bed of the stream is retained by the State or the title of the riparian owner extends to the thread of the stream, or, as in this case, to low-water mark, the rights of the title holder are subordinate to the dominant power of the federal Government in respect of navigation.

. . . .

"The dominant power of the federal Government, as has been repeatedly held, extends to the entire bed of a stream, which includes the lands below ordinary high-water mark. The exercise of the power within these limits is not an invasion of any private property right in such lands for which the United States must make compensation."

The Court there held that the determination of the need for improvement to navigation "is for Congress alone." The navigational servitude doctrine then becomes applicable within its prescribed geographical scope as it was stated in *United States v. Rands*, 389 U.S. 121, 123, 88 S.Ct. 265, 267, 19 L.Ed.2d 329:

"The navigational servitude of the United States does not extend beyond the

high-water mark. Consequently, when fast lands are taken by the Government, just compensation must be paid."

Thus the challenges are to the nature and location of the property used by the Government when its owners seek an exception to the application of the servitude. There appears to be no balancing of public good against private interest in these instances, but instead the issue is whether the segment or interest is within the definition and scope of the doctrine geographically as the above quotations demonstrate. *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332, is a variation on the geographical limitations of the doctrine.

The navigational servitude power has been exercised and upheld in cases where States own the bed of the stream. We have considered *Montana v. United States,* 450 U.S. 544, 555, 101 S.Ct. 1245, 1253, 67 L.Ed.2d 493, and noted the statement therein that the power exists "regardless of who owns the riverbed." The other cases concerning State ownership of the riverbed are basically the same. There is nothing unusual in having the ownership of a navigable stream bed vested in an entity other than the United States, and this makes no difference in the application of the power including those situations where a State owns the riverbed. *See also United States v. Holt State Bank,* 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465, and *United States v. Oregon,* 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267. Since the United States may use the doctrine of navigational servitude against the States it must also be applicable against the Cherokees in this case.

The Cherokees here assert that they are a sovereign nation and the doctrine cannot be used against them. The Court considered such a position in *Montana v. United States,* 450 U.S. 544, 563, 101 S.Ct. 1245, 1257, 67 L.Ed.2d 493, and referred to *United States v. Wheeler,* 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303, where it was said that Indian tribes are "unique aggregations possessing attributes of sovereignty over both their members and their territory." *Wheeler* also stated that the Indian tribes had lost many of the attributes of sovereignty. Again in *Montana v. United States,* 450 U.S. 544, 564, 101 S.Ct. 1245, 1257–58, 67 L.Ed.2d 493, the Court said:

"But exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation."

The Court quoted *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114, and other cases.

There would seem to be no basis by reason of the status of plaintiff to limit the application of the navigational servitude nor its consequences.

If the Indians in *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493, would have had title to the riverbed it would have made no difference in the application of the navigational servitude. As the Court there said, at 555, 101 S.Ct. at 1253:

"As the Court of Appeals recognized, *ibid.,* and as the respondents concede, the United States retains a navigational easement in the navigable waters lying within the described boundaries for the benefit of the public, regardless of who owns the riverbed. Therefore, such phrases in the 1868 treaty as 'absolute and undisturbed use and occupation' and 'no persons, except those herein designated ... shall ever be permitted,' whatever they seem to mean literally, do not give the Indians the exclusive right to occupy all the territory within the described boundaries. Thus, even if exclusivity were the same as ownership, the treaty language establishing this 'right of exclusivity' could not have the meaning that the Court of Appeals ascribed to it."

Again the exercise of the servitude is not the taking of property but the exercise of a

power to which the property owners have always been subject.

The plaintiff seems to argue that the United States somehow bargained away this power to control and improve navigation and bargained away the public nature of the Arkansas River. But again, the title elements of the several treaties were executed and the obligations merged in and were discharged by the conveyance of title to the Cherokees. There is nothing more now to add to the title to make it a "fee plus." There is no residual element in the treaties as to title. The fact that the *Choctaw* court considered history and the treaties to arrive at its conclusion and may have considered them unusual as to the title to the bed of the river does not here increase the extent or nature of the Cherokees' title which passed by the patent in 1836 as the *Choctaw* court decided. Thus the treaty rights are in the patent. The Cherokees thus on this issue are no different than would be any other entity with title to the riverbed. There is no authority and no basis for an exception to the public nature of the navigable river to create a "private river" as plaintiff urges nor to create an exception to the application of the navigational servitude because plaintiff is an Indian tribe.

There would seem to be no issue in this appeal as to the trust obligations of the United States. This matter was not considered by the trial court and there seems to be no ownership interest to be derived therefrom.

I would reverse the trial court.