# UNITED STATES *v.* CHEROKEE NATION OF OKLAHOMA

No. 85–1940.   Argued February 23, 1987—Decided March 31, 1987

REHNQUIST, C. J., delivered the opinion for a unanimous Court.

*Jeffrey P. Minear* argued the cause for the United States. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Habicht, Deputy Solicitor General Wallace, Peter R. Steenland, Jr.,* and *Jacques B. Gelin.*

*James G. Wilcoxen* argued the cause for respondent. With him on the brief was *Paul M. Niebell.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

In *Choctaw Nation* v. *Oklahoma,* 397 U. S. 620 (1970), the Court determined that certain treaties between the Cherokee, Chickasaw, and Choctaw Tribes and the United States granted to the Tribes fee simple title to the riverbed underlying specified portions of the Arkansas River in Oklahoma. The Court found the circumstances sufficient to overcome the "strong presumption against conveyance by the United States" of title to the bed of a navigable water. *Montana* v. *United States,* 450 U. S. 544, 552 (1981). See *United States* v. *Holt State Bank,* 270 U. S. 49 (1926). The question presented in this case is whether the United States must pay the Cherokee Nation compensation for damage to these riverbed interests caused by navigational improvements which it has made on the Arkansas River. The damage to sand and gravel deposits resulted from the McClellan-Kerr Project, approved by Congress in 1946, Act of July 24, 1946, ch. 595, 60 Stat. 634, 635–636, and designed to improve navigation by construction of a channel in the Arkansas River from its mouth at the Mississippi to Catoosa, Oklahoma. The project was completed in 1971.

After our decision in *Choctaw Nation,* the Cherokee Nation sought compensation from the Government. Congress refused to fund the claim after the Department of the Inte-

rior and the Army Corps of Engineers concluded that the United States' navigational servitude rendered it meritless. See Department of the Interior and Related Agencies Appropriations for 1980: Hearings Before a Subcommittee of the House Committee on Appropriations, 96th Cong., 1st Sess., pt. 7, pp. 379–392 (1979). Congress did, however, provide respondent with the opportunity to seek judicial relief, conferring jurisdiction on the United States District Court for the Eastern District of Oklahoma to determine "any claim which the Cherokee Nation of Oklahoma may have against the United States for any and all damages to Cherokee tribal assets related to and arising from the construction of the [McClellan-Kerr Project]." H. R. 2329, 97th Cong., 1st Sess. (1981).

The Cherokee Nation filed a complaint contending that the construction of the McClellan-Kerr Project resulted in a taking under the Fifth Amendment of the Tribe's riverbed interests without just compensation. The United States in response claimed that its navigational servitude precluded liability for the alleged taking. The District Court granted the Tribe's motion for summary judgment, finding that the decision in *Choctaw Nation* created a "unique situation by which a portion of the navigable Arkansas River is, essentially, a private waterway belonging exclusively to the Cherokee Nation." App. to Pet. for Cert. 26a. Because the United States did not reserve its navigational servitude in the relevant treaties, the court held, it owed the Tribe just compensation. *Id.*, at 27a.[1]

---

[1] The Cherokee Nation also claimed that, whether or not the United States' actions resulted in a taking, the failure to pay compensation violated the Government's duty to engage in fair and honorable dealings with the Tribe. The District Court did not address this claim, and certified the takings claim for interlocutory appeal under 28 U. S. C. § 1292(b). The Court of Appeals accordingly did not consider the issue, and it is not before us here.

A divided panel of the Court of Appeals for the Tenth Circuit affirmed, adopting a different analysis. 782 F. 2d 871 (1986). The court rejected the District Court's conclusion that the United States' failure to reserve its navigational servitude defeated that interest. It found it "certain [that] the United States retained a navigational servitude in the Arkansas River." *Id.*, at 876. Nevertheless, the court held that the servitude was insufficient to protect the United States from liability. Finding that "the assertion of a navigational servitude on particular waters acknowledges *only* that the property owner's right *to use* these waters is shared with the public at large," *id.*, at 877, the court believed that the effect of the navigational servitude varied with the owner's intended use: "When the exercise of that public power affects private ownership rights not connected to a navigational use, the court must balance the public and private interests to decide whether just compensation is due." *Ibid.* Applying this test, the court concluded that though the Cherokee Nation could not interfere with the United States' exercise of the navigational servitude, it had a right to compensation for any consequent loss of property or diminution in value.[2]

We think the Court of Appeals erred in formulating a balancing test to evaluate this assertion of the navigational servitude. No such "balancing" is required where, as here, the interference with in-stream interests results from an exercise of the Government's power to regulate navigational uses of "the deep streams which penetrate our country in every

---

[2] The dissenting judge found no support for the balancing of public and private interests, noting that "instead the issue is whether the segment or interest is within the definition and scope of the [navigational servitude] doctrine geographically . . . ." 782 F. 2d, at 882. Relying on *United States* v. *Rands*, 389 U. S. 121 (1967), the dissent observed that privately owned riverbed interests are subject to the navigational servitude, and found "no authority and no basis for an exception to the public nature of the navigable river to create a 'private river' as plaintiff urges nor to create an exception to the application of the navigational servitude because plaintiff is an Indian tribe." 782 F. 2d, at 883.

direction." *Gibbons* v. *Ogden*, 9 Wheat. 1, 195 (1824).
Though "this Court has never held that the navigational ser-
vitude creates a blanket exception to the Takings Clause
whenever Congress exercises its Commerce Clause authority
to promote navigation," *Kaiser Aetna* v. *United States*, 444
U. S. 164, 172 (1979), there can be no doubt that "[t]he Com-
merce Clause confers a unique position upon the Government
in connection with navigable waters." *United States* v.
*Rands*, 389 U. S. 121, 122 (1967). It gives to the Federal
Government "a 'dominant servitude,' *FPC* v. *Niagara Mo-
hawk Power Corp.*, 347 U. S. 239, 249 (1954), which extends
to the entire stream and the stream bed below ordinary high-
water mark. The proper exercise of this power is not an in-
vasion of any private property rights in the stream or the
lands underlying it, for the damage sustained does not result
from taking property from riparian owners within the mean-
ing of the Fifth Amendment but from the lawful exercise of a
power to which the interests of riparian owners have always
been subject." *Rands, supra,* at 123.[3] See also *United
States* v. *Kansas City Life Ins. Co.*, 339 U. S. 799, 808
(1950); *Scranton* v. *Wheeler*, 179 U. S. 141, 163 (1900).

The application of these principles to interference with
streambed interests has not depended on balancing this valid
public purpose in light of the intended use of those interests
by the owner. Thus, in *Lewis Blue Point Oyster Cultivation
Co.* v. *Briggs*, 229 U. S. 82 (1913), the Court held that no tak-
ing occurred where dredging carried out under the direction
of the United States destroyed oysters that had been culti-

---

[3] Though *Rands* spoke in terms of riparian owners, rather than those
holding fee simple title to riverbed interests, our cases make clear that the
navigational servitude is dominant to riverbed interests no matter how ac-
quired. See, *e. g., United States* v. *Chicago, M., St. P. & P. R. Co.*, 312
U. S. 592, 596 (1941) ("Whether, under local law, the title to the bed of the
stream is retained by the State or the title of the riparian owner extends to
the thread of the stream, or . . . to low-water mark, the rights of the title
holder are subject to the dominant power of the federal Government in re-
spect of navigation") (footnotes omitted).

vated on privately held lands under the waters of the Great South Bay in New York. The decision rested on the view that the dominant right of navigation "must include the right to use the bed of the water for every purpose which is in aid of navigation." *Id.*, at 87. The Court did not rely on the particular use to which the private owners put the bed, but rather observed that their very title to the submerged lands "is acquired and held subject to the power of Congress to deepen the water over such lands or to use them for any structure which the interest of navigation, in its judgment, may require." *Id.*, at 88. See also *United States* v. *Commodore Park*, 324 U. S. 386, 390 (1945); *United States* v. *Chicago, M., St. P. & P. R. Co.*, 312 U. S. 592, 596–597 (1941).

These well-established principles concerning the exercise of the United States' dominant servitude would, in the usual case, dictate that we reject respondent's "takings" claim. We do not understand respondent to argue otherwise. See *e. g.*, Brief in Opposition 11–12; Tr. of Oral Arg. 16, 28–29. Instead, the Cherokee Nation asserts that its title to the Arkansas River bed is unique in scope and that interference with that interest requires just compensation. Respondent does not rely explicitly on any language of the relevant treaties, but rather on its reading of *Choctaw Nation* v. *Oklahoma*, 397 U. S. 620 (1970). We have noted that *Choctaw Nation* involved "very peculiar circumstances," *Montana* v. *United States*, 450 U. S., at 555, n. 5, in that "the Indians were promised virtually complete sovereignty over their new lands." *Choctaw Nation, supra*, at 635. These circumstances allowed the claimants to overcome the strong presumption against conveyance of riverbed interests by the United States, designed to protect the interests of the States under the equal-footing doctrine. See *Montana* v. *United States, supra*, at 551–553; *Shively* v. *Bowlby*, 152 U. S. 1, 48–50 (1894). Respondent urges that these circumstances further indicate that the United States abandoned its navigational servitude in the area. Thus, in respondent's view, the

treaties by which it gained fee simple title to the bed of the Arkansas River were such as to make the Arkansas River a "private stream," Brief for Respondent 28, "not intended as a public highway or artery of commerce." *Id.*, at 23.

We think that the decision in *Choctaw Nation* was quite generous to respondent, and we refuse to give a still more expansive and novel reading of respondent's property interests. There is certainly nothing in *Choctaw Nation* itself that suggests such a broad reading of the conveyance. To the contrary, the Court expressly noted that the United States had no interest in retaining title to the submerged lands because "it had all it was concerned with in its *navigational easement* via the constitutional power over commerce." *Choctaw Nation, supra,* at 635 (emphasis added). The parties, including respondent here, clearly understood that the navigational servitude was dominant no matter how the question of riverbed ownership was resolved. See, *e. g.*, Brief for Petitioner in *Cherokee Nation* v. *Oklahoma,* O. T. 1969, No. 59, p. 19 ("[T]here is nothing in the conveyance of title to the land beneath the navigable waters which conflicts with the power of the Government to hold such lands for navigation").[4]

Any other conclusion would be wholly extraordinary, for we have repeatedly held that the navigational servitude applies to *all* holders of riparian and riverbed interests. See *Montana* v. *United States, supra,* at 555; *United States* v.

---

[4] See also Reply Brief for Petitioner in *Cherokee Nation* v. *Oklahoma,* O. T. 1969, No. 59, pp. 13–14 ("Throughout their brief respondents imply that if title to the river were vested in the petitioner and not in the state (under the equal footing-implied trust doctrine) the authority and power of the United States would somehow be compromised. Such an inference is absurd; no matter who holds title to the riverbed, the petitioner or the state, the rights and power of the United States are precisely the same"). Respondent now argues that these statements merely admitted the power of the United States to exercise the servitude, but did not waive its right to compensation when this exercise damaged its interests. See Brief for Respondent 34. We find no support for the existence of such a "hybrid" navigational servitude in these circumstances.

*Grand River Dam Authority,* 363 U. S. 229, 233 (1960); *United States* v. *Chandler-Dunbar Water Power Co.,* 229 U. S. 53, 63 (1913), citing *Gibson* v. *United States,* 166 U. S. 269, 271 (1897). Indeed, even when the sovereign States gain "the absolute right to all their navigable waters and the soils under them for their own common use" by operation of the equal-footing doctrine, *Martin* v. *Waddell,* 16 Pet. 367, 410 (1842), this "absolute right" is unquestionably subject to "the paramount power of the United States to ensure that such waters remain free to interstate and foreign commerce." *Montana* v. *United States, supra,* at 551. If the States themselves are subject to this servitude, we cannot conclude that respondent—though granted a degree of sovereignty over tribal lands—gained an exemption from the servitude simply because it received title to the riverbed interests. Such a waiver of sovereign authority will not be implied, but instead must be "'surrendered in unmistakable terms.'" *Bowen* v. *Public Agencies Opposed to Social Security Entrapment,* 477 U. S. 41, 52 (1986), quoting *Merrion* v. *Jicarilla Apache Tribe,* 455 U. S. 130, 148 (1982). Respondent can point to no such terms.

We also reject respondent's suggestion that the fiduciary obligations of the United States elevate the Government's actions into a taking. It is, of course, well established that the Government in its dealings with Indian tribal property acts in a fiduciary capacity. See *Seminole Nation* v. *United States,* 316 U. S. 286, 296–297 (1942). When it holds lands in trust on behalf of the tribes, the United States may not "give the tribal lands to others, or . . . appropriate them to its own purposes, without rendering, or assuming an obligation to render, just compensation for them." *United States* v. *Creek Nation,* 295 U. S. 103, 110 (1935). These principles, however, do little to aid respondent's cause, for they do not create property rights where none would otherwise exist but rather presuppose that the United States has interfered with existing tribal property interests. As we have explained,

the tribal interests at issue here simply do not include the right to be free from the navigational servitude, for exercise of the servitude is "not an invasion of any private property rights in the stream or the lands underlying it . . . ." *United States* v. *Rands,* 389 U. S., at 123.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*