568 So.2d 657 (1990)
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION & DEVELOPMENT, Plaintiff-Appellant,
v.
Laura Peacock ANDERSON, et al., Defendants-Appellees. (Two Cases)
Nos. 89-258, 89-259.
Court of Appeal of Louisiana, Third Circuit.
October 3, 1990.
*658 Frederick J. Fuselier, Baton Rouge, and Bertrand & Soileau, Ronald J. Bertrand, Rayne, for plaintiff-appellant.
Watson, Murchison, Crews, Arthur & Corkern, R. Raymond Arthur, Natchitoches, for defendants-appellees.
Before GUIDRY, STOKER and LABORDE, JJ.
STOKER, Judge.
This is an Interstate 49 expropriation suit. The issues raised by the State on appeal involve (1) the damages awarded for "fixed, nonrecurring" economic losses, (2) the damages awarded for "annual, recurring" economic losses and (3) the interest awarded on the judgment. We reverse in part, modify in part and render.

FACTS
The State filed a petition to expropriate 102.901 acres of cotton farmland from a 1500-acre farm owned by Laura Peacock Anderson and People's Bank & Trust Company (trustee). A short time later, the State filed a petition to expropriate another 7.909 acres from the same tract. The State deposited a total of $189,746 in the court registry as compensation for the taking. The landowners answered the suits asking for additional compensation due to undervaluation by the State of the property taken, for depreciation of the remaining property and for the costs of curing various problems caused by the taking, such as access and drainage. The two suits were consolidated for trial.
The trial judge awarded damages as follows:[1]
1. $226,636 for the land and improvements taken;[2]
2. $86,724 for severance damage in the form of decreased value to some of the remainder land and the "costs to cure" necessary to maintain the value of other remainder land;
3. $66,800 in fixed, nonrecurring economic losses;
4. $1,303,812 in annual, recurring economic losses over the next twenty-five years;
5. $250,000 for attorney fees; and,
6. $40,000 in expert witness fees.
The State appeals this judgment and assigns as errors the following:
1. The trial judge erred in awarding $66,800 in fixed, nonrecurring losses based on the testimony of Dr. Melvin Stevens. These losses, if any, were losses to the tenant and not to the landowners.
2. The trial judge erred in awarding compensation for economic loss for the next twenty-five years based entirely on speculative testimony.
3. Alternatively, the trial judge erred in awarding compensation for economic loss for the next twenty-five years to the landowner based on greater expenses in farming since the landowners did not pay the expenses.
4. The trial judge erred in awarding interest from the date of taking rather than the date of demand.
The State also contends that if the award of damages is reduced, the award of attorney *659 fees should also be reduced in accordance with LSA-R.S. 48:453(E).

FIXED, NONRECURRING ECONOMIC LOSSES

1.
The State contends the trial judge erred in awarding "fixed, nonrecurring economic losses" ($66,800) to the landowners and, alternatively, that if such damages are due they should be awarded to the tenant farmer rather than the landowners. Dr. Melvin Stevens, an expert in agriculture and farm management, testified on behalf of the landowners as to their economic losses.
The alleged fixed, nonrecurring economic losses at issue include such items as loss of use land (in the remainder of the landowners' property) required for field roads, additional turn and point rows, and ditches; land, fences and water wells for moving cattle raising operations; and loss of use land for a right-of-way for neighboring landlocked landowners.
Our discussion at this point will also bear to some extent on our consideration of Assignments of Error 2 and 3 involving annual recurring economic losses treated in more detail later in this opinion.
This court considered so-called "economic losses" projected by Dr. Stevens of the same types involved here in State, DOTD v. Crawford Business Trusts, 538 So.2d 1078 (La.App. 3d Cir.), writ denied, 542 So.2d 1381 (La.1989) and State, DOTD v. Messenger, 556 So.2d 906 (La.App. 3d Cir.1990). In both cases Dr. Stevens testified, as he does here, concerning what he denominates as "fixed, nonrecurring economic losses" and "annual recurring losses." In these two cases we recognized as a general proposition that landowners, who are themselves engaged in farming operations, are entitled to compensation of the one-time kind of loss typically represented by loss of use of land for additional turn rows, point rows, field roads, ditches and such. We did not allow damages for long-term losses (the annual, recurring economic losses) because we considered them speculative. In Crawford Business Trusts we allowed the one-time losses, not as fixed, nonrecurring economic losses, but as severance damages. In Messenger we did not allow the one-time losses because they could not be distinguished from the severance damages which were approved, and we deemed them to be a duplication of severance damages.
We find it unnecessary to consider the validity of Dr. Stevens' projections, a subject for which he undoubtedly has high qualifications. We also find it unnecessary to discuss extensively the right of landowners to recover economic losses resulting from expropriations as affected by the Louisiana Constitution, Art. 1, § 4. We briefly touched on this question in Messenger at page 909. The recent Louisiana Supreme Court case of State, DOTD v. Dietrich, 555 So.2d 1355 (La.1990), illustrates that under our law economic losses are recoverable where they are sought by landowners who themselves conduct commercial enterprises on the land and where the losses are proved by hard evidence.
What we must consider here is that neither Mrs. Anderson nor the bank as trustee for her husband's estate were in the business of farming the land in question. They were lessees without any interest in the costs or profits of the farming operation conducted by the tenant. Mrs. Anderson and the bank were awarded traditional severance damages of both the cost-to-cure type and the depreciation type in the sum of $86,724. The State has not appealed this award. Assuming without deciding that Dr. Stevens' projections for what he calls fixed, nonrecurring economic losses are valid, it is our opinion that these losses were suffered by the tenant alone. For that reason we reject the defendants-landowners' claim of $66,800 in so-called fixed, nonrecurring economic losses.[3]
*660 Although in Crawford Business Trusts we allowed the fixed, nonrecurring economic losses testified to by Dr. Stevens but classified them as severance damages, we perceive that for the most part they are of a different species from traditional severance damages measured by cost to cure and depreciation. Typical of the items in question is what is referred to by Dr. Stevens as loss of land use. The losses occur because of the necessity, caused by the taking, of devoting land formerly used to actually grow crops to service areas for such things as roads, ditches, point rows and additional turn rows. Given the distinctive nature of these losses, they are losses to whoever tills the land, in this case the tenant.
For the foregoing reasons we will reverse the trial court's award of $66,800 as fixed, nonrecurring economic losses.

ANNUAL RECURRING ECONOMIC LOSSES

1.
The State next contends that the award of damages for annual, recurring economic losses calculated for a twenty-five-year period is based on speculation and should not have been awarded. Perhaps the trial court award under this heading can be disposed of on the same ground as the one-time losses, that is, on the ground that the tenant, not the landowners would experience such losses, if any. However, we will discuss this award for the purpose of according complete treatment to the subject and because of new arguments made by the landowners.
We previously considered this issue in Crawford Business Trusts and Messenger. Dr. Stevens used the twenty-five-year time frame because he felt that for the next twenty-five years the highest and best use of the land would be cotton farming. The factors considered in calculating these damages were (1) more turnaround time for tractors and airplanes due to shorter rows, (2) longer distances to travel between fields, (3) more exposure of men and machinery to public roads, (4) increased labor and fuel costs, (5) increased wear on equipment, (6) less efficient weed and insect control, and (7) reduced cotton production due to moving cotton fields from the land taken to the lesser quality land remaining. Dr. Stevens did not consider such factors as the actual profits, losses and expenses of the farming operations before and after the taking.
In Crawford Business Trusts and Messenger, Dr. Stevens projected annual, recurring economic losses for a twenty-five-year period for the same kind of factors he considered in this case. We rejected the claims in those cases for such losses. We adhere to our holding that awards for such claimed annual, recurring economic losses are based on speculative projections without supporting proof of actual expenses, profits and losses in farming.
In State, DOTD v. Dietrich, supra, the Louisiana Supreme Court approved an award of economic losses in cattle-raising operations. The landowners raised cattle on the land affected by an expropriation by the State. The landowners proved their losses through presentation of concrete facts based on their business records and testimony of their own accountant which compared actual income, profits and losses, and proof of specific losses from a forced sale of cattle caused by the splitting of the original tract of land by the expropriation. The economic damages were not speculative. Moreover, the annual loss was limited to four years as the Supreme Court thought that the situation causing the loss could be cured by the landowners within that time.
For the reasons stated above we reverse the $1,303,812 award for annual, recurring economic loss. In fairness to the trial judge, we should note that at the time he *661 rendered judgment in this case, our decisions in Crawford Business Trusts and Messenger had not been handed down.

2.
Counsel for the defendants-landowners candidly recognizes that the position previously taken by us in Crawford Business Trusts (and followed in Messenger) is adverse to recognizing annual, recurring economic losses over a twenty-five-year period as analyzed and projected by Dr. Stevens. However, counsel takes another tack and urges that we consider losses involving what is referred to as the "cotton allotment problem." Counsel argues that the cotton allotment problem results in losses to the defendants-landowners which are distinguishable from annual, recurring economic losses rejected in Crawford Business Trusts.
We can best state counsel's argument concerning the cotton allotment question by quoting his own well articulated argument contained in his brief:
"The record establishes, fully and completely, the importance of the cotton allotment to the landowner, to the necessity of protecting cotton allotment, to the loss in this case caused directly by the taking of cotton land requiring the cotton allotment to be placed on inferior land, and the loss translated directly into reduced rental to the landowner.
"The Interstate 49 and the highway interchange (all of which is situated on the Anderson plantation) took about 111 acres of the best cotton land in Natchitoches Parish. In order to farm in this day and time, it is essential that a cotton farmer participate in the `cotton allotment program' administered by the federal government. This is not actually a matter of choice; it is essential for every farmer to utilize the cotton allotment program. The alternative is total failure. The record will support this assertion.
"The cotton allotment goes with the land not with any tenant. Each farm must protect the land allocated for the cotton allotment program. Therefore, in this case, the approximate 111 acres lost had to be re-established on other areas of the plantation, less desirable as cotton land, and generally with more clay content. This caused the tenant to lose three quarters of a bale per acre. In turn, the land became less valuable to the landowner because of this `transplanted' cotton allotment, requiring a reduction in lease payments from $70,000 per year to $50,000 per year. The record will substantiate, therefore, that as a direct result of the 1-49, and in particular the loss associated with the transfer of the cotton allotment acreage, the landowners lost an annual rental of $20,000 per year."
The record does establish through the testimony of Mrs. Anderson and the tenant, Mike Phillips, that the landowners acceded to Phillip's request for a reduction in lease payments by $20,000 annually. However, we do not agree with the argument that the landowners have suffered a loss which the State must compensate. The tenant was made whole by the reduction in rent. The tenant is preserving the cotton allotment which goes with the land. The State's argument regarding the claimed $20,000 in lease payments is as follows:
"Even if one were to assume, however, that the $20,000 per year reduction in rental will continue to be felt by the landowners as a result of the expropriation, the pecuniary position of the landowners has not been damaged. Prior to the expropriation, the landowners owned a piece of property from which they realized $70,000 per year in rent. After the expropriation, the landowners have approximately 110 acres less property, but that lost land has been replaced by $289,466 in the form of a cash asset. This latter figure represents the total of the award for the part taken and severance damages (less the $23,914 awarded for cost to cure items). Thus, whereas before the expropriation the landowners had only one asset, i.e., the farm, which could produce income, they now have two assets, namely, the remainder farm and the cash asset of $289,466, which can produce income."
*662 The State points out that the landowners' own economic expert, Earl Thames, stated that the average rate for ten-year securities in 1985 was 10.62%. If the landowners had invested the $289,446 cash asset referred to above, they would have realized annual interest income of $29,523 which exceeds the alleged $20,000 annual loss in lease payments.
We agree with the State's position. Accordingly, we reject the defendants-landowners' claim that they should be awarded damages resulting from the adjustment downward of the lease payments attributable to the cotton allotment problem.

DATE ON WHICH INTEREST ON AWARD BEGINS TO RUN
The trial court awarded interest on the amount of the award to the defendants-landowners from the date of the taking, January 4, 1985, until paid. The State contends that the trial court erred in that interest should run from the date on which the defendants-landowners filed an answer demanding more than the State deposited in the registry of the court in conformity with the quick-taking statute, LSA-R.S. 48:441 et seq. The governing portion of the statute is LSA-R.S. 48:455.
The Louisiana Legislature changed the date from which interest on expropriation awards shall run through Acts 1988, No. 882, § 1 which became effective on August 15, 1988. Prior to that date, under LSA-R.S. 48:455, legal interest began to run "as of the date title vests in the plaintiff [the State]," which is the date of the taking. Under the 1988 amendment of Section 455, of Title 48, interest begins to run "from the date of legal demand." Legal demand means the date a defendant-landowner files an answer to the State's quick taking suit to seek an award greater than the amount of the State's deposit. Thus, the State pays a lesser amount of interest under the amended version of Section 455 than formerly.
The State contends that the 1988 amendment applies to any interest which may be due in this case. The defendants-landowners disagree. We believe that the State's position is incorrect. The trial court signed its judgment on September 9, 1988, in conformity with reasons for judgment signed on August 25, 1988. Both dates fall after the effective date of the 1988 amendment, August 15, 1988. The State would have the courts apply the amendment retroactively. Whether the amendment applies retroactively or applies prospectively only depends upon whether the legislature has so provided; and, in the absence of such legislative provision, the question depends upon the nature of the law, that is, whether it is substantive or is procedural or interpretative.
Article 6 of the Louisiana Civil Code (see former Article 8) provides:
"In the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretative laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary."
In our opinion the provision for recovery of interest provided in LSA-R.S. 48:455 is a substantive law. It establishes a right as opposed to providing a procedural or adjective law prescribing a method of enforcing rights or obtaining redress for their invasion. See Frito-Lay, Inc. v. WAPCO Constructors, Inc., 520 F.Supp. 186 (M.D.La. 1981).
The State calls our attention to three cases in which three other circuits have considered the question of the date on which interest on an award begins to run. These are State, DOTD v. McClendon, 552 So.2d 1220 (La.App. 5th Cir.1989), writ denied, 556 So.2d 38 (La.1990); Dept. of Transp. & Dev. v. Williamson, 557 So.2d 731 (La.App. 2d Cir.), writ denied, 563 So.2d 1157 (La.1990) and State, DOTD v. Maynard, 565 So.2d 532 (La.App. 4th Cir.1990), rendered on June 2, 1990.
The Fourth and Fifth Circuits take a position contrary to ours, but the Second Circuit in a dicta statement in a footnote took the position which we take and specifically declined to follow the reasoning expressed in McClendon and followed in Maynard.
*663 In McClendon the Fifth Circuit approached the problem by considering the statutory provision fixing the date from which interest begins to run as a remedy rather than substantive right. The following, from which one judge dissented, is the Fifth Circuit majority's summarization of its opinion as found on page 1222:
"Here, defendants' substantive right to bring a cause of action against the State, seeking compensation and damages for property taken, was not abridged by the amendment. The sole effect of the amendment was to alter the date from which interest was calculated thus making this change remedial in nature, rather than substantive. Prior to judgment, defendants' right to assert a claim for interest was not absolute. Instead, it was contingent upon a finding that defendants were in law and in fact entitled to excess compensation. Therefore, we find that retroactive application of the amended statute would not divest defendants of any constitutionally protected property right."
In Maynard the Fourth Circuit followed McClendon and held that the statutory change relative to the running of interest did not alter substantive rights and should be applied retroactively. This issue appears not to have been raised in the Second Circuit in the Williamson case, but in a dicta statement in Footnote 4 (557 So.2d 731, 735), that Circuit took note of McClendon. The Second Circuit stated that "[because] the change in the statute affects substantive rights, it will not be applied retroactively." Further, the Second Circuit said it declined to follow the reasoning of McClendon. Writs were denied in McClendon and Williamson. Until the Louisiana Supreme Court speaks more directly to the subject, we prefer to follow the reasoning we have set forth.
For the foregoing reasons the trial court did not err in providing that interest on the award should run from the date of the taking in this case, January 4, 1985.

ATTORNEY FEES
The trial court awarded to defendants $250,000 for attorney fees. The modification of the judgment awarding damages to defendants results in an excessive award of attorney fees since the fees awarded may not exceed 25% of the difference between the damages awarded and the amount deposited in the registry of the court. LSA-R.S. 48:453(E). The difference between the amount awarded, as reduced by us, ($313,360) and the amount deposited ($189,746) is $123,614. Twenty-five percent of this difference is $30,903.50. We therefore modify the award of attorney fees to $30,903.50.

CONCLUSION
For the reasons given above, the judgment of the trial court is reversed as to the $66,800 and $1,303,812 awarded for economic losses. Accordingly, the amount of the damages is reduced to the sum of $313,360, less the sum of $189,746 previously deposited in the registry of court for a net award of $123,604, together with legal interest from the date of the taking, January 4, 1985, until paid. The judgment of the trial court is modified to reduce the attorney fee award to the sum of $30,903.50. In all other respects, the judgment of the trial court is affirmed. Costs of this appeal are assessed to defendants-appellees.
REVERSED IN PART; MODIFIED IN PART; RENDERED.
NOTES
[1] The trial court judgment awarded one set of damages for both tracts of land expropriated, treating them as one tract since they were contiguous and owned by the same parties.
[2] This figure of $226,636 is composed of the following: (1) $221,620 for land taken, 110.81 acres at $2,000 per acre; (2) $3,836 for improvements taken; (3) $164 for a permanent drainage servitude; (4) $62 for a designated temporary construction servitude; and (5) $954 for a "non-designated" temporary construction servitude.
[3] In any event the sum of $66,800 awarded by the trial court as fixed, nonrecurring economic losses would have to be reduced by two amounts: $4,040 and $10,000. The figure of $4,040 represents an amount assigned by Dr. Stevens as the value of land given by the landowners as a servitude of passage or right-of-way in favor of landlocked adjacent owners. The landowners' counsel concedes that the State is not responsible for this item. The figure of $10,000 results from an apparent error in calculation or typographical error in the total which Dr. Stevens lists in his report for fixed, nonrecurring economic losses for Tract 2. He lists a total of $21,860 but the items total only $11,860.