631 So.2d 1266 (1994)
RED RIVER WATERWAY COMMISSION, Plaintiff-Appellant,
v.
Willie Lindsey WADDLE, et al., Defendants-Appellees.
No. 93-318.
Court of Appeal of Louisiana, Third Circuit.
January 26, 1994.
*1268 Henry B. Bruser III, Randall Lee Wilmore, for Red River Waterway Com'n.
William Preston Crews Jr., Daniel T. Murchison, for Willie Lindsey Waddle, et al.
Randal D. LaFleur, for Federal Land Bank of Jackson.
Billy Lynn West Jr., for J.F. Lent, et ux.
Ted David Hernandez, for Palm Petroleum Corp.
Before GUIDRY, KNOLL and SAUNDERS, JJ.
SAUNDERS, Judge.
This is a consolidated expropriation appeal brought by plaintiff-appellant, Red River Waterway Commission, from two judgments in favor of appellees rendered as a result of takings in connection with the Socot Realignment Project on the Red River. The first judgment is in favor of the family of Willie Lindsey Waddle in the amount of $278,608.00 together with interest, expert witness fees, *1269 costs and attorney's fees. The second judgment is in favor of the family of Ella Dickson Blewer in the amount of $652,748.00 plus interest, expert witness fees, costs and attorney's fees.

FACTS
"This was very protracted and complicated litigation which began on February 5 and 6, 1987 and culminated in a jury trial which began on April 20, 1992 and ended sixteen days later on May 5, 1992. These were two consolidated expropriation actions whereby the Red River Waterway Commission expropriated a substantial portion of the land of these farmers for purposes of a navigation channel for the Red River Waterway Project. In the process the commission placed an even larger portion of their land on the opposite side of the new channel from their farm, making it inaccessible and effectively rendering it useless. In addition, other portions of their land which remained on the same side of the river as their principal farm was destroyed for agricultural purposes as a result of inundation by two to ten feet of river sand which was deposited on their land as a result of the high bank being cut through to make the new channel. This high bank along the edge of the original channel protected the crop land and pasture land which lay at a lower elevation in the interior of this Florida-shaped point. When the navigation channel was cut through the high banks it exposed the lower central portion of the peninsula to flooding at much lower water levels. In addition, the landowners had a lovely lake of approximately 120 acres which was destroyed as a result of the failure of the navigation project contractors to follow the plans and specifications supplied to them by the U.S. Corp. of Engineers. The failure of these contractors to follow the plans enabled the river to cut through the high bank which protected their lake to the point where there was insufficient high bank between the lake and the river with the result that the lake was blown out and effectively destroyed for recreational purposes."[1]
The Commission deposited $171,400.00 in the registry of the court as compensation for 126.4 acres of Waddle property taken and $117,550.00 for 120.5 acres of Blewer land taken. This litigation followed as a result of the landowner's seeking compensation in excess of the amounts deposited.

ASSIGNMENTS OF ERROR
Plaintiff-appellant, Red River Waterway Commission (hereinafter referred to as the Commission), assigns the following as error:
1. THE TRIAL COURT'S LEGAL ERRORS AND PARTIAL CONDUCT DENIED THE COMMISSION A FAIR AND IMPARTIAL TRIAL.
2. THE TRIAL COURT ERRED IN REFUSING TO GRANT THE COMMISSION'S REQUEST FOR MISTRIAL.
3. THE TRIAL COURT ERRED IN DISMISSING MS. MARTIN FROM THE JURY ABSENT ANY INDEPENDENT DETERMINATION OF IMPROPRIETY.
4. THE JURY ERRED IN FAILING TO CREDIT THE COMMISSION FOR ITS DEPOSITS IN AWARDING JUST COMPENSATION TO THE LANDOWNERS.
5. THE JURY ERRED IN SUBSTITUTING ITS OWN OPINION FOR THAT OF THE EXPERTS IN DETERMINING THE VALUE OF THE LAND.
6. THE JURY ERRED IN FINDING THE COMMISSION LIABLE FOR TORT DAMAGES ALLEGEDLY RESULTING FROM FAULT OF A FEDERAL AGENCY.
7. THE JURY ERRED IN FINDING THAT THE LANDOWNERS WERE ENTITLED TO DAMAGES FOR WADDLE/BLEWER LAKE.
8. THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY REGARDING ORDINARY HIGH WATER LINE.

*1270 9. THE TRIAL COURT ERRED IN EXCLUDING EVIDENCE SHOWING THAT WADDLE/BLEWER LAKE WAS BELOW THE ORDINARY HIGH WATER LINE.
10. THE JURY ERRED IN AWARDING THE LANDOWNERS SEVERANCE DAMAGES.
11. THE JURY ERRED IN AWARDING ADDITIONAL LOSSES TO THE LANDOWNERS FOR WADDLE/BLEWER LAKE.
12. THE JURY ERRED IN AWARDING SEVERANCE DAMAGES AND ADDITIONAL LOSSES FOR WADDLE/BLEWER LAKE BECAUSE THIS AWARD CONSTITUTES DOUBLE RECOVERY.
13. THE JURY ERRED IN AWARDING DAMAGES RESULTING FROM BANK CAVING OR EROSION.
14. THE TRIAL COURT ERRED IN REFUSING TO ALLOW THE COMMISSION TO INTRODUCE HISTORICAL EROSION DATA.
15. THE JURY ERRED IN AWARDING DAMAGES TO THE LANDOWNERS AS A RESULT OF SEDIMENTATION.
16. THE TRIAL COURT FAILED TO PROPERLY INSTRUCT THE JURY ON ECONOMIC LOSS.
17. THE JURY ERRED IN AWARDING ECONOMIC LOSS DAMAGES.

ASSIGNMENT OF ERROR NO. 1IMPARTIAL JUDICIAL CONDUCT
By this assignment of error, the Commission contends that the trial judge's conduct denied the Commission a fair and impartial trial by jury and as a result, it requests that we make a de novo review. These contentions include allegations that the attorneys for the Commission were unfairly criticized in the jury's presence, that the trial judge unfairly mischaracterized appellant's witnesses' testimony and invaded the province of the jury by making factual determinations and commenting on the evidence in the jury's presence. Essentially the Commission contends that the trial judge failed to maintain its impartiality, which was largely reflected in its evidentiary rulings.
After our review of the entire record, we do not find that the attitude of the trial judge denied the Commission a fair jury trial. We note that the trial of this case lasted for over two (2) weeks, likely trying the patience of all of the participants. Several of appellant's contentions regarding the propriety of the trial judge's legal rulings on evidentiary matters will be discussed hereinafter, but we find an insufficient basis, on the grounds of judicial bias or misconduct, to grant appellant a trial de novo. As such, this assignment of error is found to be without merit.

ASSIGNMENTS OF ERROR NOS. 2 AND 3REQUEST FOR MISTRIAL AND JUROR MISCONDUCT
The Commission contends that the trial judge erred in not holding an evidentiary hearing on the extent of alleged jury impropriety, in not granting a mistrial and in dismissing Ms. Martin, one of the jurors.
During the trial, it was brought to the court's attention that one of the jurors, Ms. Walker, had contacted one of the parties, Ms. Waddle. Subsequently, the trial judge questioned Ms. Waddle regarding a phone call which she informed the court she had received from Ms. Walker the previous day. By phone conversation, Ms. Walker had informed her that Ms. Martin, another juror, was attempting to persuade a third juror, Ms. Dunn, to rule against the Waddle family. The trial judge then inquired whether counsel for either party had questions or comments to be put on the record. Mr. Bruser, attorney for the Commission, inquired as to whether Ms. Walker had indicated the views of any other jurors to Ms. Waddle. Ms. Waddle stated that Ms. Walker had not mentioned any other jurors.
Attorney for the Commission, Mr. Bruser, then moved for a hearing with the jury to determine the extent of the problem. The trial judge overruled the motion. Mr. Bruser asked that Ms. Walker be stricken from the jury, to which the judge responded that he would only strike Ms. Walker if he also dismissed Ms. Martin, the alleged original *1271 instigator of the problem. Mr. Bruser moved for a mistrial which the trial judge denied stating that an admonition would be proper.
Subsequently, the Commission gave notice of its intent to apply for writs from the trial judge's denial of its motion to strike Ms. Walker from the jury. Attorney for the landowners, Mr. Crews, noted, for the record, that he had also moved for the dismissal of Ms. Martin from the jury. Mr. Crews then moved to dismiss both jurors, Ms. Walker and Ms. Martin. The trial judge granted this motion and dismissed both jurors and impaneled the two substitute jurors. The record does not reflect any objection to this ruling, although Mr. Bruser was stopped by the trial judge when he attempted to speak.
We note that, in response to the trial judge's denial of appellant's motion to have the jury questioned, counsel for appellant did not object. Instead, Mr. Bruser moved that Ms. Walker be removed from the jury. In response to the denial of this second motion and the trial judge's ruling that if he struck Ms. Walker from the jury, he would also dismiss Ms. Martin, Mr. Bruser, at this time, moved for a mistrial. The trial judge denied the motion for mistrial finding that an admonition would be sufficient.
After reviewing the evidence and the trial judge's questioning of Ms. Waddle, we find that the trial judge's decision to deny appellant's motion for mistrial was not an abuse of discretion. Motions for mistrial should be granted upon proof of prejudicial misconduct, occurring during a jury trial, which cannot be cured by admonition or instruction. See Searle v. Travelers Ins. Co., 557 So.2d 321 (La.App. 4th Cir.1990). In this case, the trial had been in progress for one week and the judge was "trying to make a common sense ruling."
Appellant, in brief, contends that "[a]pparently Dunn and Tolar, two of the remaining six jurors, also had prematurely decided the case favorably to the landowners." This assertion is not supported by the record. Ms. Dunn was the juror whom Ms. Martin was allegedly attempting to persuade to rule against the Waddles. The sole reference to Mr. Tolar was during the questioning of Ms. Waddle wherein she indicated that Ms. Walker said that Mr. Tolar was a fine man. We do not find that this evidence amounts to a premature decision by Dunn and Tolar in favor of the landowners.
Ultimately, the trial judge, after dismissing Ms. Walker and Ms. Martin from the jury, replaced them with two alternate jurors. We note that Holmes, one of the alternate jurors, voted against the majority and in favor of the Commission, while the other alternate juror, Jones, voted with the majority. Based upon our review, we do not find that there exists proof of juror misconduct occurring during the trial which was not cured by the dismissal of the two jurors involved and by admonition.
As such, we find no merit in these assignments of error.

ASSIGNMENTS OF ERROR NOS. 4 AND 5COMPENSATION FOR LAND TAKEN
The Commission contends that the jury failed to give credit for the deposits which it placed into the registry of the court. The verdict form clearly set out the dollar amounts which the Commission had deposited into the registry of the court for the benefit of the Waddles and Blewers. Therefore, we cannot merely delete the deposits from the jury awards under the presumption that the jury failed to give the Commission credit.
Additionally, the Commission contends that the jury erred in substituting its own opinion for that of the experts in determining the value of the land taken. We do note that, in each instance, the highest allowable jury award must be based upon evidence presented at trial, specifically, the highest expert appraisers' testimony. The jury's award exceeded this amount and we have reduced it accordingly.
The jury awarded the Blewers $160,000.00 for the land taken in addition to the amount of $117,550.00 previously deposited by the Commission in the registry of court. This would total an award to the Blewers, for the *1272 land taken in servitude, in the amount of $277,550.00 or approximately $2,300.00 per acre.
Dr. Stevens appraised the same property at $2,000.00 per acre for 120.5 acres for a total of $241,000.00. Mr. LaCaze appraised the same land taken from the Blewers and valued the property at $139,635.00, using different valuations for different types of acreages, the highest being $1,450.00 per acre for 82.6 acres of cropland.
LaCaze's figures included 31.5 acres valued at $350.00 per acre, which acreage is below the ordinary high water line (OHWL). Although the record is unclear as to whether these 31.5 acres below the OHWL are included in Stevens' calculations, it would appear that they are insofar as both appraisers ultimately value a total acreage of 120.5 acres.
A jury's factual findings are entitled to great deference and may not be reversed unless they are manifestly erroneous. See Lirette v. State Farm Insurance Co., 563 So.2d 850 (La.1990). Based upon the expert evidence presented, we find that the jury abused its discretion in awarding a total of $277,550.00 for the 120.5 acres of Blewer land taken. This is clear as there was no evidence presented that the Blewer land taken in servitude was worth $2,300.00 an acre or $277,550.00. The highest amount a reasonable jury could have awarded was $241,000.00, the appraisal testified to by Dr. Stevens which was the highest appraisal of the experts. A credit will be allowed for the $117,550.00 deposited by the Commission into the court registry leaving a balance due to the Blewers of $123,450.00 for the taking of their land.
With regard to the Waddle tract taken, the jury awarded an additional award of $191,608.00 after the Commission deposited the amount of $171,400.00 in the registry of the court for a total compensation award of $363,008.00. We are again bound by the highest expert appraiser's opinion as being the highest allowable jury award.
Dr. Stevens, using 126.4 acres, the amount set out in the order of expropriation, valued the land taken above the OHWL at $1,800.00 per acre, to arrive at a total value for the Waddle land of $227,520.00. This appraisal was based upon comparable sales to the Commission in lieu of expropriation. Stevens' appraisal was the highest appraisal presented at trial and is $135,488.00 lower than the total amount awarded to the Waddles by the jury of $363,008.00.
The Waddle's other appraiser, Mr. LaCaze, valued the Waddle land taken at $184,858.00. This appraisal included a total of 291.03 acres, including 27.4 acres in crop land at $1,450.00 per acre, 96.46 acres in pasture land at $800.00 per acre, 163.17 acres below the OHWL at $350.00 per acre, and 4.0 acres for the access road at $1,700.00 per acre, together with $4,050.00 for fencing taken.[2]
In light of the evidence presented by the appraisers testifying for the Waddles, we find that a jury award totaling $363,008.00 constitutes an abuse of discretion. The highest award which a reasonable jury could have awarded was $227,520.00, the appraised value of the Waddle land testified to by Dr. Stevens. After allowing a credit for the $171,400.00 already deposited by the Commission in the registry of the court, there remains a balance due to the Waddles of $56,120.00 for just compensation on their land taken.

ASSIGNMENT OF ERROR NO. 6 LIABILITY OF COMMISSION
By its sixth assignment of error, the Commission contends that they are not the proper party to be held liable for the damages to the East bank remainder. They allege that they are merely the local sponsor of the Corps of Engineers which is the actual party responsible for the navigational improvements to the Red River Waterway. Essentially, the Commission contends that damages to the East bank are not a result of the expropriation but instead, are due to the actions of the Corps of Engineers and the result of construction works not done in accordance *1273 with the plans and specifications of the Corps of Engineers. The Commission contends that it is not obligated to pay the landowners for damages caused to them by third parties.
Art. I, § 4 of the Louisiana Constitution expanded a landowner's recovery to the "full extent of his loss" when property is expropriated for "public purposes":
Section 4. Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.
Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is public and necessary shall be a judicial question. In every expropriation, a party has the right to trial by jury to determine compensation, and the owner shall be compensated to the full extent of his loss....
LSA-R.S. 34:2301, et seq., created the Red River Waterway District and governing Commission and granted the Commission the authority to expropriate property in order to carry out its objectives. LSA-R.S. 34:2309 provides, in pertinent part:
In addition to the powers and authority elsewhere granted in this Chapter, the commission is hereby granted, shall have, and may exercise all powers necessary or convenient for the carrying out of its objects and purposes, including, but without limiting the generality of the foregoing, the following:
(1) to sue and be sued, and as such to stand in judgment;
* * * * * *
(4)(a) To expropriate property subject to and in accordance with the general laws of the state in reference thereto;
* * * * * *
(c) Prior to a proceeding authorized by (a) or (b) of this Subsection, the commission shall include with offers of acquisition a current survey showing all property to be acquired or taken, including batture.
* * * * * *
(6) to bear the expense, in whole or part, of the relocation, construction and maintenance of public ways within the lands acquired by the commission;
* * * * * *
(9) for capital outlay, including the cost of acquisition of rights-of-way and compensation for such severance and other collateral damages necessarily incurred in connection with such acquisition....
The land belonging to the Blewers and the Waddles was taken on February 5-6, 1987, pursuant to quick take expropriation proceedings authorized under LSA-R.S. 48:441, et seq. LSA-R.S. 48:453, in the quick taking statute, states as follows:
A. The measure of compensation for the property expropriated is determined as of the time the estimated compensation was deposited into the registry of the court, without considering any change in value caused by the proposed improvement for which the property is taken.
B. The measure of damages, if any, to the defendant's remaining property is determined on a basis of immediately before and immediately after the taking, taking into consideration the effects of the completion of the project in the manner proposed or planned.
C. The owner shall be compensated to the full extent of his loss. The court shall include in its consideration the difference between the rate of interest of any existing mortgage on an owner-occupied residence and the prevailing rate of interest required to secure a mortgage on another owneroccupied residence of equal value.
D. The defendant shall present his evidence of value first.
E. Reasonable attorney fees may be awarded by the court if the amount of the compensation deposited in the registry of *1274 the court is less than the amount of compensation awarded in the judgment. Such attorney fees in no event shall exceed 25% of the difference between the award and the amount deposited in the registry of the court.
Under both LSA-R.S. 34:2309 and LSA-R.S. 48:453, we find that the landowner is entitled to compensation to the full extent of his loss by the expropriating authority, in this case, the Red River Waterway Commission.
As such, we find no merit in this assignment of error.

ASSIGNMENTS OF ERROR NOS. 7, 8, 9, 10, 11, AND 12DAMAGES TO WADDLE-BLEWER LAKE
By these assignments of error, the Commission contends that the jury erred in awarding both severance damages and damages for loss of recreational use, loss of fish harvest and restocking costs. The Commission also contends that the trial judge erred in excluding evidence intended to show Waddle-Blewer Lake was below the OHWL and therefore, non-compensable; and in failing to instruct the jury regarding the OHWL.
On approximately May 29, 1991, the lake "blew out" and a large portion of the water in the lake drained into the river. Recreational fishing after this event was severely curtailed due to the resulting shallow and muddy water in the lake and loss of recreational fish to the river.
The landowners contend that the lake "blew out" due to the weakened condition of the lake's high bank as a result of the Corps of Engineer's work on the channel. This weakened bank condition, together with water which rapidly fell or "drew-down" into the river after high water, caused the saturated high bank on the lake to collapse or "blow-out."
The Commission contends that the landowners had both the upstream and downstream natural drains of the river blocked and that when the river fell, this earthen dam across the drain collapsed, causing the blowout of the lake.
The evidence revealed that prior to the cutting of the new channel, there was a high bank all around the lake which protected it from the ordinary rise and fall of the river. In late 1988, the plug in the channel gave way and the erosion and caving of the northeast high bank began. As a result, the Corps of Engineers put in a dike to try to protect the Northeast bank. Additionally, a structure designed to divert the river into the new channel was placed on the West bank of the river. This caused a current which caused the Northeast high bank to cave and erode.
John Page, an engineer with the Corps of Engineers, testified that the tie back dike on the Northeast high bank was not constructed in accordance with the plans and specifications of the Socot Realignment Project. The plans called for a bankhead, a 125 foot bank of rock to be installed, but the Corps installed dike ties instead because they had no right-of-way on the East remainder above the OHWL and felt that they would not be allowed on the high bank. The rock was never installed due to the potential right-ofway problem. Page testified that he did not feel that the scour hole was far enough into the East bank to threaten the lake regardless of the change in plans and specifications as to the Northeast bank.
At the time of trial, the Northeast bank was still caving, although the Corps of Engineers did do some emergency work armoring the bank after the blowout in May of 1991.
The differing versions as to the cause and location of the blowout was a question of fact for the jury to determine. Evidence was presented as to both locations of the "blowout"these being approximately 250 feet apart. The jury apparently accepted the landowners' version of the facts, presented through lay testimony and expert opinion.
A court of appeals may not set aside a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. See Rosell v. ESCO, 549 So.2d 840 (La.1989), on remand, 558 *1275 So.2d 1360, writ denied, 561 So.2d 105 (La. 1989).
The Commission contends that the jury has awarded double recovery by awarding both severance damages and reclamation damages in the form of loss of recreational use, loss of fish harvest and restocking costs. We find no merit in this contention.
The jury awarded the Blewers $89,748.00 and the Waddles $27,000.00 for damages to Waddle-Blewer Lake, a lake owned in part by each of the parties. The Blewers owned 61.48 acres of the lake, while the Waddles owned 27.65 acres. This award is affirmed as it is supported by the testimony of Mr. Lantz, a fisheries biologist with the Louisiana Department of Wildlife and Fisheries, testified on behalf of the landowners as to the recreational or economic losses to Waddle-Blewer Lake due to the blowout. He testified that at the time of his visit in June of 1991, the lake was dewatering into the river. He continued by testifying that the recreational fish population had decreased in the lake and had been replaced with a higher percentage of "rough" or river fish. Without determining the cost of removing the excess silt and/or sand from the bottom of the lake and the cost of re-establishing some type of barrier between the lake and the river, Mr. Lantz merely determined the cost to the landowners to reclaim their lake which had been relatively clear, several feet deeper and had been an excellent recreational fishing resource. The total loss, calculated by Lantz, assuming a reclamation planned would take four (4) years to complete, totaled $162,589.00 for the entire lake. Lantz then assigned this loss to the Waddles and the Blewers in proportion to their respective assignment by using a standard value in Louisiana of $22.00 per day per trip factored into the approximate amount of fishing trips taken by the Waddle and Blewer families, which totaled 903 trips per year for a value of $19,866.00 or $79,464.00 over four (4) years. Without including any amount to clear out the sand and refurbish the lake bottom, Lantz went on to testify that the dollar value of a fish harvest lost on an annual basis would be $12,460.00 per year or $49,840.00 for four (4) years. Lantz testified further that the restocking cost of a lake this size, 89 acres, would be $33,285.00.[3]
Under these facts, we find that a reasonable jury could have awarded losses for the lake of $89,748.00 and $27,000.00 for a total of $116,748.00 to the Blewers and Waddles, respectively. This amount would compensate the landowners for their loss of enjoyment ($19,866.00 times 4 years) during the time period necessary to restore the lake. Additionally, this award would be sufficient to compensate the landowners for the restocking of the lake at a cost of $33,285.00.
It is true that an award for both loss of recreational enjoyment and loss of fish harvest would constitute a double recovery insofar as the award for the loss of enjoyable fishing trips would include the catching or harvesting of fish. Additionally, had the jury award included severance damages, it would also have constituted double recovery.
Nevertheless, we note that the amount of $116,748.00 awarded by the jury is significantly lower than the $162,589.00 testified to by Lantz as being necessary to reclaim the lake. This jury award is low enough to insure that there is no double recovery.
The Commission also contends that Waddle-Blewer Lake is below the OHWL and therefore, under the federal navigational servitude, no compensation is due the landowners for losses resulting from projects of the Corps of Engineers. In the same vein, the Commission contends that the trial court erred in disallowing evidence showing the lake was below the OHWL. Finally, the Commission contends that the trial court erred in failing to instruct the jury as to the OHWL.
The trial court disallowed any evidence that the lake might have been below the OHWL because he felt that the Waddles and Blewers were entitled to rely upon the determination of the OHWL made by the Commission *1276 at the time of the taking and attached to the petition of expropriation in February of 1987.
This determination of the river's OHWL did not show Blewer-Waddle Lake as being below the river's OHWL. Shortly before trial, the Corps of Engineers/Commission redeliniated the OHWL to include Blewer-Waddle Lake within the federal navigational servitude. The trial judge felt that, in fairness, and to avoid confusing the jury, such evidence would be disallowed.
The trial judge additionally disallowed any evidence that the lake was below the OHWL because he found that there was no evidence that the lake was under the annual influence of the river prior to the cutting of the new channel and the destruction of the high bank. Thus, he found that the lake had not been subject to the federal navigational servitude prior to the cutting of the channel.
There was testimony presented that there were approximately 200 yards of land between the lake and the river prior to the blowout. The jury did hear testimony that the river had not come into the lake for 7 years prior to the blowout and that the Blewers had always been able to put in a crop before the channel was cut. Finally, there was testimony that prior to the channel cut, approximately once every three years the river would back up into the lake and then recede leaving the lake elevation at its normal level. In essence, prior to the blowout, the river would flow into the lake when at flood stage but the lake was not under the influence of the ordinary rise and fall of the river on an annual basis. After the blowout, the lake would fall lower than its normal level when the river receded, causing a loss of lake elevation.
We find that the trial judge erred in taking this issue of fact from the jury. The evidence was relevant and should have been admitted. Insofar as the evidence was proffered into the record, we have reviewed the proffered evidence on a de novo basis. It is our finding that even if admitted, the evidence, taken as a whole, would not have changed the result of the trial. We find that the lake was not under the river's annual influence at the time of the taking, but was instead, an area occasionally influenced by the river. Therefore, we find that the exclusion of this evidence, although relevant, did not constitute reversible error.
Finally, in view of our de novo determination that Blewer-Waddle Lake was not subject to the annual influence of the Red River prior to the taking, any discussion as to the propriety of the trial court's exclusion of the proffered jury instruction regarding the OHWL of the Red River, is hereby pretermitted as unnecessary.[4]
Thus, we find these assignments of error without merit.

ASSIGNMENTS OF ERROR NOS. 13, 14 AND 15SEVERANCE DAMAGES TO REMAINDER CAUSED BY BANK CAVING EROSION AND SEDIMENTATION
By these assignments of error, the Commission contends that the jury erred in awarding damages resulting from bank caving, erosion and sedimentation. Additionally, it contends that the trial court erred in refusing to allow evidence regarding historical erosion on the Red River.
The jury awarded the Blewer family $153,000.00 and the Waddle family $60,000.00 for severance damages. These damages included *1277 compensation for acreage actually lost through erosion and bank caving in addition to compensation for the loss of land available for agricultural purposes due to sedimentation and sanding.
Dr. Stevens, an appraiser specializing in farmland, viewed the property January 30, 1988. Giving the land lost on the East remainder the same value as the land taken, i.e., $2,000.00 per acre, Stevens calculated that on the Blewer property 57 acres or $114,348.00 had been lost for agricultural use due to sanding and 35 acres or $70,000.00 had been lost due to actual loss of land from erosion and caving banks. He calculated the Blewer's total severance loss at $184,380.00.
As to the Waddle severance damages to the East remainder, Stevens calculated that 33.3 acres valued at $1,800.00 per acre were no longer available for agricultural use due to sanding. An additional 11.6 acres suffered less severe sanding damage and had a remaining residual value of $600.00 per acre, for a loss of $14,016.00. Under Stevens' analysis, the total Waddle loss in severance damages totaled $73,956.00.[5]
The properties were also appraised by the landowners' other appraiser, LaCaze, who valued the severance damages on the Blewer property at $123,556.00 and on the Waddle property at $49,872.00.
LaCaze's analysis of the Blewer acreage on the East remainder consisted of the following findings. The Blewers had 48.59 acres which had been in the ASCS (Agricultural Stabilization and Conservation Service) set aside program which were sanded over and no longer eligible for agricultural use. LaCaze valued this land at $1,250.00 per acre as set aside land and $250.00 per acre after being sanded over for a remaining value of $12,148.00.
As to the 67.9 acres between the lake and the channel consisting of farmland, 23.79 acres had completely eroded due to bank caving, leaving 44.11 acres physically remaining. LaCaze testified that in some areas of this acreage, there were four (4) to eight (8) feet of sand deposits making this land unusable for farming. LaCaze valued this 44.11 acres remaining at $250.00 per acre for a total value of $11,027.50.
Near the levee, the Blewers had 22.54 acres previously in pasture which retained its value after the taking at $650.00 per acre for a value of $14,651.00. Finally, LaCaze decreased the 61.48 acres of land the Blewers had in the lake from $500.00 per acre to $250.00 per acre for a total remaining value of $15,370.00. The difference in the value of the remaining land, according to LaCaze, before and after the taking as the result of the partial taking, totaled severance damages of $123,556.00.
LaCaze did a similar analysis of the severance damages to the Waddle property remaining after the taking. He calculated that the 49.09 acres behind the lake which also suffered from sand deposits would be valued at $250.00 per acre for a total remaining value of $12,273.00. The acreage in the lake itself decreased in value from $500.00 to $250.00 per acre for 27.68 acres for a remaining value of $6,920.00. The total loss or severance damages amounted to $49,872.00.[6]
The evidence presented by the landowners was such that a reasonable jury could have found that the damage was caused as a result of the expropriation due to the failure of the Corps of Engineers to complete the project as planned and due to design errors. The evidence revealed that the initial sanding of several feet was caused by the premature blowout in 1987 of the plug designed to block the entrance of water into the channel until construction was finished. This blowout and the improper alignment of structures built to divert the river to the new channel caused significant caving of the bank. As discussed in the previous assignment of error, the second blowout of the high bank above the lake in May of 1991 caused additional silting to both the land and the lake.
Under this analysis, we find no manifest error on the part of the jury in awarding *1278 $153,000.00 to the Blewers and $60,000.00 to the Waddles in severance damages.
Additionally, the Commission contends that the trial court erred in failing to allow it to present evidence about historical erosion data on the Blewer-Waddle properties. Essentially, the Commission wanted to present evidence to the jury that, due to the natural meandering of the Red River, the Blewers and Waddles would have eventually lost the land which was taken and damaged as a result of the project at issue and therefore, they sustained no compensable losses beyond those already paid by the Commission.
The trial court rejected this theory and disallowed any evidence as to the natural meandering of the Red River on the basis that there was very little remaining that was natural about the Red River after the numerous projects, completed and ongoing, undertaken by the Corps of Engineers which had changed the course of the river.
The Commission took writs to this court on this evidentiary issue, which writs were denied without discussion.
We find no error or abuse of discretion on the part of the trial court in its ruling. The argument that "the river would have taken the land if we hadn't" was not a proper defense to present to the jury and would clearly not compensate the landowners to the extent to which they were constitutionally entitled, that is, to the full extent of their loss.
As such, we find no merit in these assignments of error.

ASSIGNMENTS OF ERROR NOS. 16 AND 17ECONOMIC LOSS AWARD TO BLEWERS
The Commission next contends that the jury erred in granting the Blewers an award for economic damages for loss sustained by their farming operation. The Blewers lost a total of 102.9 acres of prime cotton-producing land in the expropriation, both through the taking and as a result of sanding or caving on the East remainder. These 102.9 acres were part of a farm unit being used as a base with the ASCS Office. The Waddles leased 52.9 acres of this farm unit to the Blewers for $9,000.00 per year. After the taking, pursuant to the testimony of Mrs. Waddle, she now leases the Blewers 93 acres in lieu of the damaged acreage which the Blewers previously used as cotton land and charges the same rental fee of $9,000.00 per year.
After hearing the testimony of several experts, the jury awarded the Blewers $250,000.00 for the economic loss sustained, over the remaining lease period of 17 years, as a result of having to shift their cotton base or allotment to less productive acreage.
We find that this award constitutes a double recovery for the Blewers. The evidence reveals that they have retained their base or allotment in the ASCS program and they have retained their lease with the Waddles.
It is clear that the premium price awarded by the jury for the cotton land included the value of the cotton allotment. In other words, the fair market value paid for the land reflected the future stream of income the property would have produced in the cotton program. In a non-expropriation sale, the allotment would have been sold with the land. In this case, the Blewers retained the allotment and also were awarded the full value of their land. To allow the Blewers to claim future loss of profits from the use of an allotment which they retained as a windfall would clearly constitute double recovery. A similar result was reached in State, Dept. of Transp. & Dev. v. Anderson, 568 So.2d 657 (La.App. 3d Cir.1990) wherein we held that a lessee-farmer was fully compensated for losses due to the expropriation of cotton farmland by an adjustment in the lease as is a landowner-farmer fully compensated by cash payments for expropriated land. See also State, DOTD v. Messenger, 556 So.2d 906 (La.App. 3d Cir.1990) (future economic damage award reversed as being a duplication of severance damage award). Therefore, we reverse the jury's award of $250,000.00 to the Blewers for economic loss to their farm unit.

CONCLUSION
Due to our reduction of the award for the land expropriated, defendants are entitled to *1279 $143,120.00 with interest, in addition to the sums deposited, together with 25% attorney's fees on all amounts awarded at trial and on appeal.
In all other respects, the judgment of the trial court is affirmed. Costs at the trial level are assessed to Red River Waterway Commission, appellant herein. Costs on appeal are assessed equally to appellant and appellees.

DECREE
AFFIRMED IN PART; MODIFIED IN PART AND RENDERED.
GUIDRY, C.J., and KNOLL, J., concur.
NOTES
[1] Quoted from the trial court's reasons for judgment on a motion to fix fees and cost.
[2] LaCaze testified that under a highest and best use analysis, 45 acres of the land below the ordinary high water mark which was taken was in cultivated pastures and would be valued at $650.00 per acre, increasing LaCaze's appraisal by $13,500.00 for a total appraised value of $198,358.00.
[3] $79,464.00 in recreational loss, $49,840.00 loss of fish harvest and $33,285.00 restocking costs for a total of $162,589.00.
[4] The following Commission's proposed jury instructions were rejected:

WATERWAY COMMISSION'S REQUESTED SPECIAL JURY CHARGE NO. 11
The ordinary high water mark of a river is a natural physical characteristic placed upon the lands by the action of the river. It is placed there, as the name implies, from the ordinary flow of the river and does not extend to the peak flow or flood stage so as to include overflow on the flood plain, nor is it confined to the lowest stages of the river flow.
United States v. Claridge, 416 F.2d 933 (9th Cir. 1969).
WATERWAY COMMISSION'S REQUESTED SPECIAL JURY CHARGE NO. 12
The Waterway Commission does not owe any money for land which was, at the time of the taking, at or below the ordinary high water line of the Red River.
U.S. v. Cherokee Nation of Oklahoma, 480 U.S. 700, 107 S.Ct. 1487, 1489-90, 94 L.Ed.2d 704 (1987).
[5] Stevens' analysis did not include any severance damages for Waddle-Blewer Lake.
[6] LaCaze's analysis did include severance damages to the Blewers of $15,370.00 and to the Waddles of $6,920.00 for Waddle-Blewer Lake.