United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 30, 2004**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT

No. 02-20442

AIR LIQUIDE AMERICA CORPORATION; EGP FUELS COMPANY; EQUILON
PIPELINE COMPANY, LLC; EXXON PIPELINE COMPANY; FLORIDA GAS
TRANSMISSION COMPANY; HOUSTON PIPE LINE CO.; HSC PIPELINE
PARTNERSHIP LP; MOBIL CHEMICAL COMPANY, an unincorporated
division of Mobil Oil Corporation; MOBIL PIPELINE COMPANY;
SEADRIFT PIPELINE CORPORATION; TE PRODUCTS PIPELINE COMPANY
LIMITED PARTNERSHIP; TEXAS EASTERN TRANSMISSION CORP.; UCAR
PIPELINE INCORPORATED; CHEVRON CHEMICAL CO.; CHEVRON PIPELINE
CO.; DYNEGY MIDSTREAM SERVICES; TEPPCO CRUDE OIL LLC,

Plaintiffs-Counter Defendants-
Appellees-Cross-Appellants,

DUKE ENERGY TRANSPORT AND TRADING COMPANY,

Plaintiff-Counter Defendant-Appellee,

AIR PRODUCTS INCORPORATED; AIR PRODUCTS MANUFACTURING
CORPORATION; BLACK MARLIN PIPELINE COMPANY;
TEJAS SHIP CHANNEL LLC; TEJAS SOUTH PIPELINE PARTNERSHIP,

Intervenor Plaintiffs-Appellees-Cross-Appellants,

versus

US ARMY CORPS OF ENGINEERS,

Defendant-Counter Claimant-
Appellant-Cross-Appellee,

PORT OF HOUSTON AUTHORITY OF HARRIS COUNTY, TEXAS,

Movant-Appellant-Cross-Appellee.

**AIR LIQUIDE AMERICA CORPORATION; EGP FUELS COMPANY;
EQUILON PIPELINE COMPANY LLC; EXXON PIPELINE CO.;
FLORIDA GAS TRANSMISSION COMPANY; HOUSTON PIPE LINE CO.;
HSC PIPELINE PARTNERSHIP LP; MOBIL CHEMICAL COMPANY,
an unincorporated division of Mobil Oil Corporation;
MOBIL PIPELINE COMPANY; SEADRIFT PIPELINE CORPORATION;
TE PRODUCTS PIPELINE COMPANY LIMITED PARTNERSHIP;
TEXAS EASTERN TRANSMISSION CORP.; UCAR PIPELINE INC.**

**Plaintiffs-Appellees-Cross-Appellants,**

**DUKE ENERGY TRANSPORT AND TRADING COMPANY,**

**Plaintiff-Appellee,**

**versus**

**PORT OF HOUSTON AUTHORITY OF HARRIS COUNTY, TEXAS,**

**Defendant-Appellant-Cross-Appellee.**

**Appeal from the United States District Court
for the Southern District of Texas**

Before BARKSDALE, DeMOSS, and BENAVIDES, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

At issue is cost-allocation for privately owned pipelines under the Houston Ship Channel (channel) being relocated as part of the project by the United States Army Corps of Engineers and the Port of Houston Authority to widen and deepen the channel. The Corps and the Port appeal the partial summary judgment awarded the pipeline owners: *inter alia*, the Port was held responsible for the relocation cost. Owners' conditional cross-appeal is from the

2

district court's denial of their alternative summary judgment claim: that the project was for a deep-draft harbor; and that, accordingly, the Port would have to bear half of the relocation cost.

The principal sub-issues are: whether, as held by the district court, the Port must bear the cost, pursuant to TEX. WATER CODE § 60.102 (relocation cost to be borne by district if it "required" the relocation); and, if not, whether, in requiring Owners to relocate the pipelines at their expense, the Corps was properly enforcing both the federal navigational servitude and the Corps' associated federal permit authority.

Texas law does *not* control. Consistent with, *inter alia*, the Corps' well-settled authority to enforce its permits, Owners were required to relocate their pipelines at their expense. Concerning Owners' conditional cross-appeal, the project was *not* for a deep-draft harbor; therefore, the Port was *not* required to bear half of the relocation cost. **VACATED in PART; AFFIRMED in PART; and RENDERED.**

I. The Rivers and Harbors Act of 1899, 33 U.S.C. § 401 *et seq.*, prohibits construction in navigable waters of the United States unless the work has been approved by the Secretary of the Army. Pursuant to this Act, and for more than 100 years, the Corps has regulated such construction, in part by issuing permits under § 10 of that Act. 33 U.S.C. § 403. These § 10 permits provide, *inter*

*alia*, that pipelines and other structures beneath navigable waters are to be relocated at no expense to the United States if required by federal navigation interests or projects. In the 1940s and 50s, the Corps issued § 10 permits to Owners to install pipelines beneath the channel. Each permit mandates pipeline-relocation as required by navigation needs and at no cost to the government.

Similarly, when the Texas legislature granted ownership of the land under the channel to the Port in 1927, the Port was given authority to franchise or lease the land for limited periods and purposes. *See* Act of March 11, 1927, 40th Leg., R.S., ch. 292, 1927 Tex. Gen. Laws 437. Accordingly, in addition to a federal § 10 permit, each Owner holds a license from the Port. One license condition is that Owners must relocate their pipelines at their cost if necessary for the channel.

In 1967, the House Committee on Public Works authorized a study for improving deep-draft channels, including the channel. The reconnaissance report for this study was completed in 1980.

The next step was the Water Resources Development Act of 1986 (WRDA-86), Pub. L. No. 99-662, 100 Stat. 4082 (1986); 33 U.S.C. § 2201 *et seq.* It contained the following cost-allocation provision:

> The non-Federal interests [here, the Port] for a [harbor navigation project] *shall perform or assure the performance of all relocations of utilities* necessary to carry out the project, *except that in the case of a project for a deep draft harbor* [deeper than 45 feet] *one-half of the cost* of each such relocation shall be borne by the owner of the facility being

4

> relocated and one-half of the cost ... shall
> be borne by the non-Federal interests.

33 U.S.C. § 2211(a)(4) (emphasis added).

The feasability study for the project was completed in 1987. In May 1995, the Corps published a draft report for public review that recommended proceeding with the channel's expansion. The draft report stated that Owners would bear the cost for relocation of approximately 130 pipelines. No Owner responded to the Corps about this notice.

The final version of the notice — the Limited Reevaluation Report (LRR) — was published in November 1995. The LRR estimated the pipeline relocation cost would exceed $100 million; and, as did the draft report, the LRR stated that Owners would bear that cost. Again, the Corps received no response from Owners. At the end of the comment period, the LRR was incorporated in the Chief of Engineers' Report (Chief's Report), which was transmitted to Congress by the Secretary of the Army.

The project was authorized by the Water Resources Development Act of 1996 (WRDA-96), Pub. L. No. 104-303, 110 Stat. 3658 (1996); 33 U.S.C. § 2330 *et seq*. That Act provided: "[t]he removal of pipelines and other obstructions that are necessary for the project shall be accomplished at non-Federal expense", *id*. § 101(a)(30), 110 Stat. at 3666; and the project would be "substantially in accordance with the plans, and subject to the conditions, described in" the Chief's Report, *id*. § 101(a), 110 Stat. at 3662. Again,

one condition in that report was for the relocation cost to be borne by Owners.

As required for commencing the project, the Port entered into a Project Cooperation Agreement (PCA) with the Corps in June 1998. 42 U.S.C. § 1962d-5b(a); *see* Pub. L. No. 99-662, 100 Stat. 4082, 4083 (1986). Shortly thereafter, as requested by the Port, the Corps, by removal-notices to Owners, enforced the § 10 permit conditions and instructed Owners to relocate their pipelines at their expense because of the project's requirements. Owners complied.

In November 1998, however, Owners filed this action, seeking a declaration that the Corps' removal-notices were void. Simultaneously, Owners filed an action in state court, claiming: pursuant to TEX. WATER CODE § 60.102, the Port had "required" the relocation and was therefore responsible for the cost; and the Port's not paying it was an unconstitutional taking. In the alternative, Owners' state action claimed the project was for a deep-draft harbor pursuant to WRDA-86, subject to its mandated cost-sharing among the Port and Owners.

The state action was removed by the Port and consolidated with this action. The Port counterclaimed, seeking a declaration that either WRDA-96 or the § 10 permits required Owners to pay the relocation cost.

In early 2002, on cross-motions for summary judgment, the district court granted partial judgment to Owners, holding: WRDA-96 did not amend the cost-sharing provisions of WRDA-86; pursuant to WRDA-86, state law was to answer the cost-allocation question; under Texas law, that cost was to be borne by the Port; and the licenses issued by the Port (placing cost with Owners) were preempted by Texas law. The district court amended the Corps' removal-notices to Owners to reflect this ruling. On the other hand, the district court rejected Owners' alternative claim that the project was for a deep-draft harbor.

## II.

A summary judgment is reviewed *de novo*. *E.g.*, **Texas Soil Recycling, Inc. v. Intercargo Ins. Co.**, 273 F.3d 644, 648-49 (5th Cir. 2002). The Corps and Port contest the Port's being liable for the relocation cost and the amendment of the Corps' removal-notices. If those rulings are vacated, Owners contest the not-deep-draft-harbor-project ruling.

## A.

### 1.

As the district court concluded, the language in neither WRDA-86 nor WRDA-96 explicitly allocates the relocation cost. The district court ruled that Texas law required the Port to bear it.

Taking a similar approach, Owners contend that WRDA-86, not WRDA-96, establishes the Port's cost liability. Support is found

in the WRDA-86 conference report: "This [cost allocation] question is to be resolved between the non-Federal interest [Port] and the Owners of the facilities being relocated". H.R. CONF. REP. NO. 99-1013, at 205 (1986). Along this line, Owners claim the Port must bear the cost pursuant to TEX. WATER CODE § 60.102, which provides: "If a district in the exercise of powers conferred by this subchapter [port improvement] ... requires the relocating ... of any ... pipeline, the relocating ... shall be done at the sole expense of the district".

The Corps and Port maintain: WRDA-96, not WRDA-86, controls cost-allocation; and WRDA-96 places it on Owners. As discussed in part, *infra*, it is not necessary to resolve whether WRDA-86 or WRDA-96 controls. In any event, TEX. WATER CODE § 60.102 does *not* apply. First, to trigger that section's application, the Port had to "require" the relocation. It did not (and cannot) do so. Second, as discussed *infra*, the federal navigational servitude (applied through the § 10 permits) cannot be "trumped" in the absence of a clear Congressional waiver.

As quoted in part earlier, TEX. WATER CODE § 60.102 provides: "If a district in the exercise of the powers conferred by this subchapter or in the exercise of the power of eminent domain or the police power *requires* the relocating ... of any ... pipeline, the relocating ... shall be done at the sole expense of the district".

8

(Emphasis added.)  This provision is not applicable because the Port did not *require* the relocation – the Corps did.

In this regard, the district court held, and Owners contend:

> The Corps issued the removal notices at the Port's request, acting as the Port's agent in requiring the owners to relocate the pipelines.  The Port cannot escape its obligation to pay by shunting its order through an agent.

*Air Liquide America Corp. et al. v. United States Army Corps of Eng'rs, et al.*, No. H-98-3982 at 5 (S.D. Tex. filed 25 Jan. 2002).

Under Texas law, for an agency relationship, the agent must be under the control of the principal; "even though one acts for and in behalf of another, if he is not under that other person's control, the relation of agency does not exist".  *Daily Int'l Sales Corp. v. Eastman Whipstock, Inc.*, 662 S.W.2d 60, 64 (Tex. App. 2001).  In this instance, agency would require the Port's being "in control" of the Corps; for quite obvious reasons, the Port is not.  By requiring removal of an obstacle to a navigable waterway, the Corps was acting pursuant to power delegated to it by Congress.  It was pursuant to this power, not the Port's request, that the Corps required the relocation.

Owners contend the Port required removal through the Corps by: undertaking, initiating, and financing the project; signing a PCA with the Corps; and requesting the removal-notices from the Corps.  First, the Corps, not the Port, sought Congressional approval for the project.  Second, Congress authorized the project and provided

9

the funds for construction of the navigation features, subject to partial reimbursement by the Port. Third, the Port's entering into the required PCA with the Corps in no way establishes that the Port required the relocation. To the contrary, the Port determined that it could not require pipeline relocation at Owners' expense. Therefore, the Port requested the Corps to exercise its § 10 permit authority under the federal navigational servitude.

Owners contend that, but for the Port's partial reimbursement, role in the PCA, and request that the Corps enforce the § 10 permits, there would have been no project. This misunderstands the meaning of "require" in § 60.102. These were necessary components of the project but certainly not sufficient on their own to cause the project to be undertaken. Restated, in order for the Corps and the Port to proceed, an agreement was required — the PCA. The PCA provided that the Corps would accomplish relocation, which it agreed to do through its § 10 permits. The PCA did not require the Corps to exercise its permit authority; and it certainly did not empower the Port to mandate the Corps to require pipeline relocation.

In support of their construction of state law, Owners point to TEX. WATER CODE § 50.052 (now repealed). It provided: if the district *required* relocation or alteration in its construction of any properties, it "shall be done at the sole expense of the district or authority". The Harris County Flood Control District

10

(an entity analogous to the Port) sought an opinion on whether, under § 50.052, it would be required to bear the cost for lengthening a bridge. Texas' Attorney General opined: "[I]f the district widens the channel so as to render the bridge unusable, the district may reasonably be said to have acted to require the 'relocation ... rerouting ... or alteration in construction of ... properties'". OP. TEX. ATT'Y GEN. NO. MW-412 (1981) (citing TEX. WATER CODE § 50.052).

Owners contend that § 60.102 applies to the Port in the same way. This contention neglects a crucial distinction: the Corps, not the Port, required Owners to relocate their pipelines. Similarly, the Port's request for removal-notices by the Corps did not obligate it to issue them. *See, e.g.,* **California v. Sierra Club**, 451 U.S. 287 (1981).

2.

The Corps has the authority, under the federal navigational servitude, to require Owners to pay the relocation costs according to the original permits, as necessitated by the project. *See* **United Texas Transmission Co. (UTTCO) v. United States Army Corps of Eng'eers**, 7 F.3d 436 (5th Cir. 1993), *cert. denied*, 512 U.S. 1235 (1994). Because neither WRDA-86 nor WRDA-96 includes a clear Congressional waiver of the navigational servitude, we need not reach which Act controls for cost-sharing.

Congress derives the power to control navigation from its power to regulate commerce. *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 230-31 (1824). This power has been recognized to impose a "navigational servitude", described as follows:

> *All navigable waters are* under the control of the United States for the purpose of regulating and improving navigation, and although the title to the shore and submerged soil is in the various states and individual owners under them, it is *always subject to the servitude in respect of navigation* created in favor of the Federal government by the Constitution.

*Gibson v. United States*, 166 U.S. 269, 271-72 (1897) (emphasis added). This servitude operates to the exclusion of any competing or conflicting right. *See United States v. Virginia Elec. & Power Co.*, 365 U.S. 624, 627-28 (1961).

The navigational servitude includes the right to authorize improvements to harbors and bays, as well as the power to determine what will be deemed an obstruction to navigation. *See Pennsylvania v. Wheeling and Belmont Bridge Co.*, 59 U.S. (18 How.) 421, 431 (1855). Pursuant to § 10 of the Rivers and Harbors Act of 1899, Congress delegated this power to regulate such obstructions to the Secretary of War (now Secretary of the Army). It bears repeating that each Owner (or predecessor in interest) obtained a § 10 permit prior to construction of its pipeline.

a.

12

Addressing Owners' "contractual agreement[s]", the district court held: "The licenses [issued by the Port, requiring Owners' to bear relocation cost,] are preempted by the Texas Water Code". *Air Liquide*, No. H-98-3982 at 5. As discussed *supra*, when title to submerged lands was granted to the Port in 1927, the Texas Legislature gave the Port "the right, power and authority to abate and remove any and all encroachments or structures of any kind now or hereafter existing on said property, *save such as may have been constructed under permit from the United States War Department [later the Corps]....*" Act of March 11, 1927, 40th Leg., R.S., ch. 292, 1927 Tex. Gen. Laws 437, 439 (emphasis added). The licenses issued by the Port provide that, should pipeline relocation be necessary to accommodate deepening and widening the channel, the Owner will, "at its cost and expense and without cost or expense to the Port ... remove, relocate, lengthen, deepen or otherwise conform" its pipeline to the project.

The district court ruled that Texas law preempted the licenses, in part because "[t]he Port, as a creature of the state, is bound by the regulations the state places on it". *Air Liquide*, No. H-98-3982 at 5. But, as discussed *supra*, Texas law does not apply to the relocation. Again, the Corps, not the Port, "required" it. The reason the relocation was necessary - the project - was contemplated by the licenses. Through them, Owners agreed that, in the event "any installation [of pipelines] made

13

under authority of this license shall interfere with the widening, deepening or other revision or improvement of the Houston Ship Channel", Owners would bear the relocation cost.

b.

Even if the Port-issued licenses do not control on cost-allocation, Owners would nevertheless be bound by their agreement with the Corps in the § 10 permits. As discussed, because the channel is a navigable waterway of the United States, each Owner had been required, consistent with the federal navigational servitude, to obtain a § 10 permit prior to laying a pipeline. In each permit, Owners: acknowledged they were not receiving an interest in property; and agreed that, should the Corps require, Owners would remove any obstruction (e.g., its pipeline) at no cost to the government.

Our court's decision in 1993 in *UTTCO* held that § 10 permit-holders must pay for the relocation of any portion of a pipeline located within the original permit area. *UTTCO*, 7 F.3d at 441. The permits in *UTTCO*, as in this action, required removal of obstructions "without expense to the United States", but did not explicitly require owners to bear the cost. *Id*. at 439. Nevertheless, our court held that the federal navigational servitude provided authority to enforce the terms of those permits at owner expense.

> [N]o one seriously contests the rule that the cost of relocating the portion of a pipeline

14

> lying between the original banks of the bayou (i.e., the work that was either "herein authorized" under ¶ (*f*) of the permits or covered by the navigational servitude) must be borne by the pipeline owner.

*Id*. at 444.

It was only after *UTTCO* that the Corps, in October 1995, issued written guidance — Policy Guidance Letter 44 — for when it will assert its power to require removal of an obstruction to navigation at the expense of the owner of the obstruction. When Texas and the Port determined that they did not have the authority to require relocation of more than 100 pipelines under the navigable waterway, they requested the Corps to secure their relocation under the authority of its federal navigational servitude and the corresponding § 10 permits.

The Chief's Report was then sent by the Corps to Congress concerning this authority and with a specific cost-allocation provision, noting that all relocation costs would be borne by Owners. Congress relied on this report in deciding to approve the project and formally incorporated the Chief's Report in the authorizing legislation — WRDA-96. Pub. L. No. 104-303, § 101(a)(30), 110 Stat. 3658, 3662-66 (1996).

Despite this, the district court ruled: "The adoption of the chief's report went only as far as its engineering and design recommendations, not its admonishments on cost allocation". *Air Liquide*, No. H-98-3982 at 5. The cost data in the LRR,

15

incorporated in the Chief's Report, reflects, however, that relocation costs are to be borne by Owners. For example, the LRR includes tables listing individual Owners, their specific § 10 permits, and the number and size of their pipelines.

Indeed, portions of the LRR discuss requiring Owners to bear pipeline relocation costs according to the § 10 permit power. (*E.g.*, "The cost for removal and replacement of pipelines and docking facilities located within the area of navigation servitude are not included in the cost estimate because these costs are owner costs, not project costs.")

Owners contend, erroneously, that WRDA-86 precludes the Corps' exercising § 10 permit authority to enforce the navigational servitude. For obvious reasons, Congressional waiver of this servitude must be express. *See, e.g.,* **United States v. Cherokee Nation of Okla.**, 480 U.S. 700, 707 (1987) (holding waiver of navigational servitude "will not be implied, but instead must be 'surrendered in unmistakable terms'") (quoting **Bowen v. Public Agencies Opposed to Social Security Entrapment**, 477 U.S. 41, 52 (1986)). There is no waiver in WRDA-86; the federal navigational servitude remains.

In sum, the Corps properly exercised its navigational servitude over the pipelines and waterway covered by the § 10 permits, requiring Owners to remove those pipelines at their expense.

In their conditional cross-appeal, Owners claim the project is for a deep-draft harbor within the meaning of WRDA-86: one "*authorized* to be constructed to a depth of more than 45 feet". 33 U.S.C. § 2241(1) (emphasis added). As discussed, WRDA-86 provides that obstruction relocation costs for a deep draft harbor project are to be divided equally between Owners and the non-Federal interest (here, the Port). 33 U.S.C. § 2211(a)(4).

In support, Owners contend that the design depth of 47 feet for the entrance channel of the project makes it one for a deep-draft harbor. They contend also that over-depth dredging and advance maintenance have resulted in a channel depth greater than 45 feet.

The reasoning by the district court provides the correct answer to these contentions: "The depth of the entrance is *not* the depth of the channel.... When it adopted the chief's report, Congress *authorized* the construction of a 45-foot-deep harbor, *not* a deep-draft harbor". *Air Liquide*, No. H-98-4982 at 4 (emphasis added).

### III.

For the foregoing reasons, those parts of the judgment allocating the pipeline relocation cost to the Port and amending the Corps' removal-notices to Owners are **VACATED**; that part of the

judgment concerning the project not being for a deep-draft harbor is **AFFIRMED**; and judgment is **RENDERED** for the Corps and Port.

*VACATED in PART; AFFIRMED in PART; and RENDERED*